1

UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

HON. ANTHONY W. ISHII


| | |
|---|---|
| JAMES K. JORDAN, ) | |
| ) | 1:18-cv-401 AWI-SAB |
| Plaintiff, ) | |
| ) | MOTIONS IN LIMINE, TRIAL |
| vs. ) | CONFIRMATION, MOTION TO AMEND |
| ) | PRETRIAL ORDER |
| WONDERFUL CITRUS PACKING ) | |
| LLC, a California limited ) | |
| liability company, ) | |
| ) | |
| Defendants. ) | |

Fresno, California                    Tuesday, September 3, 2019


REPORTER'S TRANSCRIPT OF PROCEEDINGS

**APPEARANCES OF COUNSEL**:

For the Plaintiff:          MARDEROSIAN & COHEN
                            1260 Fulton Mall
                            Fresno, CA 93721
                            BY:  **MICHAEL G. MARDEROSIAN**
                                 **HEATHER S. COHEN**


For the Defendants:         ROLL LAW GROUP
                            11444 W. Olympic Boulevard
                            7th Floor
                            Los Angeles, CA 90064
                            BY:  **MICHAEL M. VASSEGHI**
                                 **J.P. PECHT**
                                 **COURTNEY E. VAUDREUIL**

REPORTED BY:  PEGGY J. CRAWFORD, RDR, CRR, Official Reporter

Proceedings recorded by mechanical stenography, transcript
produced by computer-aided transcription.

2

1   Tuesday, September 3, 2019          Fresno, California

2   1:30 p.m.

3            THE CLERK:  Court calls 1:18-cv-401, James Jordan

4   versus Wonderful Citrus Packing, LLC, motions in limine, trial

5   confirmation, and motion to amend Pretrial Order.

6            MR. MARDEROSIAN:  Good afternoon, Judge Ishii.  I'm

7   Mick Marderosian.  Myself and Heather Cohen represent the

8   plaintiff, James K. Jordan, who is present here in the

9   courtroom with his wife, Chung Jordan as well.  Good

10  afternoon.

11           THE COURT:  Good afternoon.

12           MR. VASSEGHI:  Good afternoon, your Honor.  Michael

13  Vasseghi on behalf of defendant, Wonderful Citrus.

14           MR. PECHT:  J.P. Pecht.

15           MS. VAUDREUIL:  Courtney Vaudreuil.

16           THE COURT:  This is the date and time set for the

17  hearing on the motions in limine.  Also, I have received two

18  motions that I want to take up and address first.  A motion to

19  amend the Pretrial Order to include additional witnesses by

20  both sides, each side indicating specific potential witnesses.

21  I will address those in the motions in limine.

22           And then we will discuss a little bit more about the

23  trial itself, trial preparation, et cetera.

24           Before I get started, though, let me ask, are there

25  any issues, other issues we need to take up, or that I need to

1   be aware of before I take up the various motions and the trial

2   confirmation?

3           Plaintiff's side?

4           MR. MARDEROSIAN:  Your Honor, I just want to make a

5   record that Mr. Vasseghi and I have agreed that in regard to

6   notice regarding production and order of witnesses that the

7   plaintiff intends to call, we have an agreement that there are

8   certain witnesses that I intend to call in my case that

9   Mr. Vasseghi has agreed to produce.  I have agreed to give him

10  48 hours' notice as to when I will need those witnesses.

11          In regard to the order of witnesses that I intend to

12  call each day, we have agreed that I will give him 24 hours'

13  notice, and the same will apply in regard to his case, that we

14  will each have 24 hours' notice of who the witnesses will be

15  for the next day.

16          THE COURT:  Okay.  Is that agreeable with the defense

17  side?

18          MR. VASSEGHI:  That's fine, your Honor.

19          THE COURT:  Okay.  And I will do the following.  In

20  terms of the trial itself, the presentation of witnesses, the

21  order, and whether you need to take somebody out of order, and

22  even with the agreed upon notices, if, for whatever reasons,

23  witnesses go on more quickly or slowly than anticipated, and

24  scheduling issues, if you agree to go out of order, I'm okay

25  with that.  So just go ahead and keep that in mind.  I will

1  certainly leave it up to counsel.

2         Basically, I may have mentioned this at our pretrial

3  conference, what we will do, of course, once plaintiffs' side

4  begins, just make sure that you provide defense side with the

5  first set of witnesses and any proposed exhibits that you

6  intend to attempt to admit through the witness.

7         And then at the end of each evening, I will ask,

8  okay -- next day, whoever is presenting their case, "Okay.

9  Who are your witnesses?  Give me the order that they are going

10 to be appearing in and any exhibits," and then if there are

11 any issues with respect to witnesses and/or exhibits, we can

12 take it up that evening or first thing the next morning.

13        Anything else for plaintiff's side, preliminarily

14 then?

15        MR. MARDEROSIAN:  No, your Honor.

16        THE COURT:  Defense side, preliminarily?

17        MR. VASSEGHI:  Your Honor, I just wanted to discuss

18 the issue of joint exhibits with the Court.  Both parties

19 submitted exhibits to this Court as part of their Pretrial

20 Statements.  And a majority, not all of them, but a majority

21 of them were overlapping exhibits.

22        And subsequently, right now, we have only three joint

23 exhibits.  And I wanted to determine whether the Court

24 considered exhibits which were proffered by both plaintiff and

25 defendant as part of their pretrial, whether those would have

1  automatically been joint because they overlapped or not.

2          The reason I bring this up, it increases the time and

3  effort and witness testimony in terms of laying foundation for

4  the exhibits which are not joint because, obviously, the point

5  of the joint exhibits is to save some time and make the

6  process a little more efficient.  So I wanted to address that

7  issue with the Court as well.

8          THE COURT:  Sure.  In terms of the exhibit list,

9  joint exhibits, the separate exhibits, et cetera, I'm going to

10 leave that up to you folks.

11          As I mentioned earlier, the significance of

12 designating something as a joint exhibit or a party's exhibit

13 for which the other side does not object to, is it would

14 automatically come in.

15          And I don't want to step in here and say, "Okay.

16 They seem to overlap, so I'm going to designate these as joint

17 exhibits."

18          And one side or the other says, "Well, wait a minute.

19 They were overlapping, but that doesn't mean that I will

20 ultimately object to them."

21          And then we get into a problem of the Court

22 attempting to show what is a joint exhibit, which will

23 automatically come in, and not.

24          So at this point, all I can say is you still have

25 time before the trial to meet and confer and determine which

1    are joint exhibits.  Obviously, it will help both sides in

2    trial preparation, knowing which exhibits you don't have to

3    worry about in terms of any issues that might arise during the

4    course of the trial.

5           And it also will be helpful to know which are joint

6    exhibits that you might be able to mention during your opening

7    statement, which might assist the jury in following along with

8    your opening statement.

9           So I will leave that up to you folks.  So if you can,

10   certainly the Thursday before trial, if you are able to meet

11   and confer, and you have a packet of joint exhibits and

12   exhibits for which you have no opposition to the other side's

13   exhibits, that would really be helpful to the parties, mainly,

14   but, certainly, to me, because I don't think it is helpful to

15   spend an hour every morning or in the evening trying to sort

16   through objections on exhibits.

17          So obviously, you are all experienced trial counsel,

18   so you know what is required.

19          Anything else for defense side, then?

20          MR. VASSEGHI:  No, your Honor.  I mean we have some

21   housekeeping issues to deal with.  I don't know if you want to

22   take those matters up now.  Specifically, about the scope of

23   redirect and whatnot with regards to witnesses because,

24   basically, all of our witnesses are subsumed and are being

25   called by defense.

1        So I wanted to get some clarification from the Court

2   as to its preference.  I don't know if you want to discuss

3   that now, your Honor, or later.

4        THE COURT:  We can do it later.  Just my general take

5   is in terms of witnesses, oftentimes, on plaintiff's side,

6   they will call defense witnesses, and both sides agree that

7   rather than defense having to reserve direct examination to

8   defense case-in-chief, just get the witness in.  Both sides

9   examine thoroughly, and then let the witness go.

10       And that's perfectly fine with me, if both sides

11  agree as to any particular witness, "Okay.  This one, we are

12  going to have testimony, direct by both sides, and then we

13  will let the witness go," or whatever.

14       So that, again, I will leave to both sides in terms

15  of trial tactics, or whatever.  But certainly, if you agree on

16  certain witnesses that the plaintiff's side may call that are,

17  otherwise, defense would call in defense case-in-chief, that's

18  fine too.

19       All right.  And again, we can discuss other

20  procedural matters at the conclusion of the motions here.

21       All right.  I'm going to first address the two

22  motions to amend the Pretrial Order.  Plaintiff has moved to

23  amend the Pretrial Order to include additional witnesses and

24  exhibits that would be Delano police officers and the Delano

25  police report that might relate to this particular case.

1           And all I'm dealing with is to amend the Pretrial

2    Order, not the admissibility, but simply can it be part of the

3    record, as far as the Court is concerned, in compliance with

4    the rulings on the Pretrial Order.

5           So in terms of the plaintiff's motion regarding the

6    Delano police report and police officers, anything further on

7    behalf of plaintiff's side on that?

8           MS. COHEN:  No, your Honor.  I think that what's set

9    forth in our papers summarizes what our position is.

10   Obviously, we had identified Delano police officers generally

11   on the Pretrial Statement that was submitted to this Court.

12          We attempted to submit the additional specific names,

13   as well as the police report, before the Pretrial Order was

14   actually issued, but either it crossed paths, or the Court

15   wasn't inclined at that point to include them on the Pretrial

16   Order.

17          However, we did move as quickly as possible once we

18   discovered their identities as well as the existence of the

19   police report, and so I would just -- and further, in terms of

20   any alleged prejudice, obviously, Wonderful was aware of the

21   identities of these officers, as well as the existence of the

22   police report because its lead counsel, Mr. Vasseghi, is the

23   one who initiated contact.

24          So I would offer to this Court that there was no

25   prejudice to the defendants by including these additional

1    witnesses and this exhibit on the Pretrial Order.

2          THE COURT:  All right.  On behalf of defense side on

3    that motion?

4          MR. VASSEGHI:  Your Honor, I will save the Court

5    time.  We will submit on the briefs.  We have nothing further

6    to add.

7          THE COURT:  Okay.  What I'm going to do is I'm going

8    to go ahead and, in this case, I will go ahead and grant the

9    motion.  Apparently, this was information that was available.

10    There does not appear to be prejudice to defense because it

11    apparently was aware of these police reports for sometime.

12          And the apparent use of this information, if I were

13    to allow it, would only be brief testimony or brief

14    information.

15          It does not appear that there is any bad faith on

16    this, and no delay in seeking the amendment.

17          So I'm going to grant the motion to add it to the

18    Pretrial Order.  But again, there is already a motion in

19    limine regarding the admissibility of that information, and

20    I'm simply granting the motion to amend the Pretrial Order.

21          Then the defense motion to amend the Pretrial Order

22    to allow witness, Rene Flores.  Anything further on behalf of

23    defense side on that?

24          MR. VASSEGHI:  No, your Honor.  I just wanted to know

25    if the Court received our reply brief, which was submitted a

1   couple of hours after the opposition was filed on Friday, and

2   whether the Court had an opportunity to review and consider

3   that.  If they have, then I have nothing further to add, your

4   Honor.

5          THE COURT:  That's fine.

6          Plaintiff's side, on the defense motion?

7          MS. COHEN:  Yes, your Honor.  I would just reiterate

8   that this wasn't truly an impeachment witness, that he is in

9   fact a rebuttal witness, as set forth in the case authority in

10  our opposing papers.  And he should have been designated on a

11  Rule 26 disclosure, and he should have been designated on the

12  Pretrial Statement.  And here we are, on the eve of trial,

13  without having had an opportunity to depose Mr. Flores.

14         And while Wonderful maintains that there is

15  supposedly no prejudice to this delay because we have

16  supposedly known of Mr. Flores' identity through the

17  investigative report and through -- by their including his

18  name in response to one of the interrogatories, the bottom

19  line is that there were dozens of witnesses, and we had

20  attempted to depose all of these witnesses.

21         Wonderful obviously opposed that effort.  Ultimately,

22  Judge Boone encouraged us to reduce our list and see if we

23  couldn't find something in the middle, and so we removed

24  Mr. Flores from our list because, quite frankly, he hadn't

25  been identified as a key witness in the case, and we didn't

1   believe that Wonderful intended to call him, which is further

2   supported by the fact that he wasn't on any Rule 26

3   disclosure, and that he wasn't included on the Pretrial.

4          And so I would just offer, your Honor, that this is

5   highly prejudicial to us, particularly because we haven't been

6   able to depose Mr. Flores.  We haven't been able to

7   investigate as to any prejudice or bias or any impeachment

8   evidence.

9          And so I would offer to this Court that the Pretrial

10  Order shouldn't be amended as to adding Mr. Flores.

11         THE COURT:  Okay.  It does appear from the

12  information that I have that Mr. Flores was disclosed early

13  on.  I believe that there may have even been a notice of

14  deposition, which did not occur.  So this is not someone who

15  was not known to both sides.

16         So what I will do is I'm going to grant the motion to

17  amend the Pretrial Order to allow Rene Flores to be added as

18  an impeachment witness only.

19         Before either side, certainly defense side, intends

20  to call Mr. Flores as a witness, as an impeachment witness,

21  let me know well in advance.  Each side is committed to give

22  adequate notice.  And at that time, I will ask for a proffer

23  from the -- or an offer of proof from defense as to what

24  Mr. Flores would testify to.

25         In addition, as an impeachment witness, that is a

1    very specific role.  I do agree that it is not required to be

2    disclosed.  I normally put it in my Order, in part so that

3    there are no surprises, in part so that if, during jury

4    selection, the jury is aware that there may be a particular

5    witness called, so it is not a surprise when someone who is

6    not on the witness list appears to testify.

7            Having said that, though, I will allow the -- grant

8    the motion to amend the Pretrial Order to add Mr. Flores as an

9    impeachment witness only.  And the scope of his testimony, if

10   he appears to testify, will be simply for impeachment

11   purposes.

12           An impeachment witness' testimony is very limited.

13   It only attacks the credibility of one or more other

14   witnesses, and it is -- the impeachment witness' testimony, as

15   I understand it, is not substantive, so that the only thing it

16   goes to for the jury's consideration is to test the

17   credibility of any witness that an impeachment witness is

18   aimed at.

19           So keep that in mind.  And clearly, if there is a

20   jury instruction that the parties wish me to give with respect

21   to the limitations of the -- what an impeachment witness is

22   utilized by the jury, then certainly, I will entertain that.

23           MR. MARDEROSIAN:  Just a point of clarification, if I

24   may, your Honor.

25           THE COURT:  Sure.

1      MR. MARDEROSIAN:  The Pretrial Order, on page 21 of

2   the Pretrial Order, at lines 5 through 6, under the Roman

3   Numeral VII, "Witnesses" category, says that "The following is

4   a list of witnesses that the parties expect to call at trial,

5   including rebuttal and impeachment witnesses."

6      Now, this comment is not directed to the Court's

7   ruling.  I understand and accept the Court's ruling.  But in

8   regard to the trial, if there are impeachment witnesses or

9   rebuttal witnesses that the plaintiffs intend to call, are the

10  parties required to give notice or not?

11     I'm a little confused by the Court's comment on that

12  issue, and I thought it was better to expose it now so we all

13  know and there aren't any surprises with regard to any witness

14  that falls within the category of being a rebuttal or

15  impeachment witness.

16     THE COURT:  My understanding is that they are very

17  different animals.  A rebuttal witness' testimony, if believed

18  by the jury, is substantive.

19     An impeachment witness' testimony is not substantive;

20  in other words, the jury cannot substitute in an impeachment

21  witness' testimony as facts for the trial.  The impeachment

22  witness' testimony can only go to attacking or supporting the

23  credibility of a witness.

24     And so my simplistic example to the jury is if the

25  issue was whether or not a person was holding a red pen or a

1    green pen, and a witness appears under oath and says, "I saw

2    the person, and he was holding a red pen."

3         A rebuttal witness would come in to testify

4    substantively that it was a blue pen.  And if the jury

5    believes the rebuttal witness, the jury can conclude that the

6    pen was blue.

7         On an impeachment witness, you are only attacking the

8    credibility of the witness who said it was a red pen.  And if

9    the jury believes the impeachment witness, that goes to the

10   credibility of the person who said it was a red pen.

11        And so if the jury concludes that that attacks the

12   credibility of that witness, the jury can disregard that

13   testimony, in which case, if that's the only testimony, there

14   is no evidence as to what color the pen was.

15        So there is a distinction between a rebuttal witness

16   and an impeachment witness.

17        And if the defense intends to introduce Mr. Flores as

18   a witness, as an impeachment witness, it is important, with

19   respect to the jury instruction, the jury understands the

20   limitations on his testimony or any other impeachment witness'

21   testimony.  It only goes to the credibility of the witness

22   that the impeachment witness is attacking in terms of

23   credibility.

24        MR. MARDEROSIAN:  I think my comment, your Honor,

25   went to the issue of whether or not an impeachment or rebuttal

1   witness needs to be disclosed so that, you know, for example,

2   after the plaintiff rests, whether or not there are any other

3   so-called impeachment witnesses other than Mr. Flores, are we

4   supposed to know about that now.

5          My comment goes to the issue of whether or not both

6   sides are entitled to notice as to whether or not either side

7   intends to call whatever is defined as a "rebuttal" or

8   "impeachment" witness.

9          THE COURT:  Okay.  Rebuttal witnesses, yes, must be

10  disclosed.  Impeachment witnesses, sadly, no, there is no

11  requirement.  And I have to agree with that.  I just -- it is

12  the rule, and I will have to follow it.

13         Rebuttal witnesses must be disclosed.  Impeachment

14  witnesses, not necessarily.  Although I will say this.  If

15  there is an impeachment witness by either side that doesn't

16  have any kind of history that Mr. Flores apparently has, at

17  least in terms of knowledge, I will give the opponent enough

18  time to try to figure out what to do.

19         And I will look to manifest injustice to see whether

20  or not it is such a surprise to a party that perhaps I would

21  limit the testimony, or whatever.

22         But you will I can say, at least at this point, is

23  you are better off disclosing every witness that you intend to

24  call, but there is a distinction between rebuttal witnesses

25  and impeachment witnesses.

1        MR. MARDEROSIAN:  So the impeachment witness would

2    have to be treated in the 24-hour witness disclosure rule that

3    we talked about in exchanging the witnesses and the order; is

4    that correct, your Honor?

5        THE COURT:  That's what the parties have agreed on.

6    Production order of witnesses, 48 hours' notice.  Order of

7    witnesses, 24 hours' notice.  Both sides have agreed to that.

8        And I don't want any back-pedaling during the course

9    of the trial.  You both stated that's what you agreed on.  It

10   is not a rule of the Court, but that's certainly something I

11   will take into consideration if that's violated in terms of

12   prejudice to one side or the other.

13       Yes?

14       MR. VASSEGHI:  Your Honor, just so we have

15   clarification, what defense agreed to is the calling of the

16   witnesses already identified and that are known about.

17       So if plaintiff comes out of the blue, and identifies

18   a new witness that has never been identified before as a

19   rebuttal expert, then that is not something that there has

20   been an agreement on.

21       I just want to make sure that plaintiff doesn't have

22   some surprise witnesses.  They seem to suggest that maybe they

23   are thinking of somebody they haven't disclosed.

24       THE COURT:  Rebuttal witnesses are different.  They

25   have to be disclosed.  Impeachment witnesses don't have to,

1   except for the agreement that the parties arrived at as far as

2   the notice of the order of witnesses 24 hours in advance.

3           So no matter what, whether it is an undisclosed

4   impeachment -- well, if it is an undisclosed rebuttal witness,

5   whoever is the proponent is going to have a real problem

6   getting that witness in.

7           I will tell you, both sides, right now.  A rebuttal

8   witness that has not been disclosed is not likely to testify

9   during the course of the trial.

10          It is different with an impeachment witness because

11  that's what the rules say.  But it is my understanding, based

12  upon the agreement of the parties, that an undisclosed

13  impeachment witness needs to be disclosed 24 hours in advance.

14  "Okay.  This person is going to be testifying as an

15  impeachment witness."  You will get 24 hours to figure it out.

16          Anything else preliminarily?  Okay.

17          I will go ahead and address the motions in limine

18  next.  Now, I will say this.  I'm certainly going to allow the

19  parties to be heard on each and every motion in limine, but

20  it's been well briefed.  And, again, candidly, except for a

21  few questions I might have, I'm prepared to rule on what's

22  been submitted, but I'm certainly going to allow the parties

23  to be heard on the motions.

24          There are a lot of them, so I will just go through

25  them very briefly, and if you wish to elaborate a little bit

1  on some of them, you are entitled to do it that, and I will go

2  ahead and make a ruling on it.

3      Couple of things, in case I forget.  One, whatever

4  ruling I make on the motions in limine, whether you agree with

5  it or not, becomes the law of the case, and I expect the

6  parties to comply with my rulings.

7      Second, if I rule adverse to you on a motion in

8  limine, but during the course of the trial, you, in good

9  faith, believe that the Court should consider the ruling based

10  upon whatever might come up during the course of the trial,

11  you can request, out of the presence of the jury, for the

12  Court to reconsider a ruling that I make today on motions in

13  limine.

14      And, finally, if you believe that any ruling I make

15  on a motion in limine would engender, require a cautionary or

16  special instruction, go ahead and include that in your packet

17  of jury instructions, and I will go ahead and consider those.

18      And, certainly, if you have a proposed jury

19  instruction that you believe needs to be given during the

20  course of or when a witness testifies, make sure to flag those

21  so I can give the jury instruction if I think it is

22  appropriate.

23      Okay.  The first, and I will start off then with the

24  plaintiff's motion in limine.  What I will do on all the

25  motions is I will turn to the proponent first, ask you if you

 1  have any comments, get a response from the other side, and

 2  back to the proponent's side, and I will go ahead and make my

 3  ruling.

 4       Plaintiff's motion in limine number one.  Before I

 5  state, I need a correct pronunciation of this witness' name.

 6       MR. VASSEGHI:  "Marie-Pierre Desaulniers."

 7       THE COURT:  The first motion is to exclude the

 8  testimony of Ms. Desaulniers.  And so it is the plaintiff's

 9  motion.  Anything further on behalf of plaintiff on

10  plaintiff's motion in limine number one?

11       MR. MARDEROSIAN:  No, your Honor.

12       MR. VASSEGHI:  Nothing from defendant, your Honor.

13       THE COURT:  Plaintiff, anything?

14       MR. MARDEROSIAN:  No, your Honor.

15       THE COURT:  Okay.  Now, in this case, there was a

16  motion to exclude opinions, analyses, and related documents

17  from this particular witness -- or this witness.  She is

18  apparently -- is or was the Director of Special Projects for

19  The Wonderful Company LLC.  She did prepare a document

20  entitled, "Citrus Ranches Expense Analysis," dated July 12,

21  2017.  She also reviewed a number of documents, timesheets,

22  and another report.

23       And so with respect to this motion, I am going to

24  find that she is a witness under Federal Rules of Evidence

25  602; that is, she is a lay witness who is testifying with

1  respect to her personal knowledge.  Her testimony will be

2  limited to her personal knowledge.

3       She is entitled to a lay opinion or lay testimony

4  under Rule 602 based upon her personal knowledge.  She can

5  make reference to the contents of business records and other

6  documents which she did not personally prepare, but would

7  assist in her testimony.

8       Generally, though, documents that she has reviewed

9  would not necessarily be admitted through her testimony, so

10 you need to be aware of that fact.  The fact that I'm going to

11 allow her to testify regarding documents that she has reviewed

12 does not necessarily mean that they will be admitted through

13 her.

14      MR. MARDEROSIAN:  One comment I would like to make,

15 if I may, your Honor?

16      THE COURT:  Yes.

17      MR. MARDEROSIAN:  During the course of

18 Ms. Desaulniers' deposition testimony, she testified to a

19 document that she prepared, an analysis of her timesheet

20 investigation.  I asked for the production of it.

21      Mr. Vasseghi, who was representing her at her

22 deposition, since she is an employee of The Wonderful Company,

23 refused to produce it, claiming that it was work product.

24      I think that that report should be prepared,

25 produced, so that I can cross-examine Ms. Desaulniers on that

1   issue.  It is a document that she prepared.  She testified

2   that she did in her deposition.  And it is an analysis that

3   she claims she prepared and gave to another lawyer within the

4   Roll Law firm that Mr. Vasseghi works within.  They are

5   in-house counsel, as the Court knows from another motion that

6   we have made.

7           So a Wonderful employee prepares a document that goes

8   directly to the heart of the issue of her testimony.  And it

9   was not produced.  And I need that document so that I can

10  effectively cross-examine her at the time of trial.

11          In light of the Court's ruling, there is no work

12  product privilege.  And I am very familiar with the federal

13  system, that it is a system of no surprises.  And if that

14  report isn't produced, I feel that the plaintiffs are

15  prejudiced in our ability to cross-examine that witness.

16          THE COURT:  All right.  And defense position?

17          MR. VASSEGHI:  Your Honor, to the extent that was an

18  analysis that was done by Ms. Desaulniers, that was done

19  during the course of this litigation.

20          Plaintiff is asking us to exclude -- is asking the

21  Court to exclude anything that she did after the litigation.

22  Now they are backtracking and saying, no, we want an analysis

23  that she did that after the litigation.  So it seems

24  inherently inconsistent with their argument that now they want

25  this document.

1          Second of all, we are not relying on this document.

2     It is not a exhibit in anything.  And we are simply not going

3     to be looking at it.

4          Third of all, to the extent it was done, it was done

5     at the direction of counsel for purposes of litigation, and,

6     therefore, it is subject to attorney-client privilege --

7     excuse me, attorney work product privilege, and, therefore,

8     should not be produced.

9          THE COURT:  Is defense position that she is not going

10    to be relying on it or testifying about it during her

11    testimony?

12         MR. VASSEGHI:  That's exactly right.

13         THE COURT:  Okay.

14         MR. MARDEROSIAN:  Your Honor, there is a misstatement

15    here.  This term "backtracking," that's not correct.

16         This was a document that Ms. Desaulniers prepared

17    during the course of her investigation of timesheet records.

18    It wasn't something that was prepared after Mr. Jordan was

19    terminated.  She said that this was prepared prior to that,

20    and it was prepared, and given to an attorney.

21         Now, I don't know of any rule that would allow

22    counsel to claim work product but still call the witness to

23    testify and give lay opinions in this case.

24         Specifically, in her deposition, your Honor, at page

25    66 to 67 of her deposition, and I quoted it in my summary, she

1 prepared what she said was a stand-alone analysis that she

2 shared with counsel on the timesheet comparison analysis.

3       This has not been produced, and it is something that

4 she prepared during the course of her work.  Well, I want to

5 see what that is.  Maybe it says things that are completely

6 contrary to her deposition testimony that will be the

7 testimony of her case.

8       I understand that Mr. Vasseghi has admitted in his

9 records that she is not going to be testifying as to things

10 she did subsequent to her deposition.  He said that in his

11 records.

12       So this issue doesn't deal with any backtracking over

13 that.  I understand that.  She is only allowed to testify as

14 to what she had done and testified to in the deposition that I

15 took of her.  And this was something she prepared.

16       So what if she says, on this witness stand, "It is a

17 green pen," but in that report, she told the attorney, "It is

18 a red pen"?  I think we would be highly prejudiced if that

19 report, which she referred to in her deposition under oath, at

20 pages 66 to 67, that she prepared.

21       THE COURT:  Let me do the following.  At least at

22 this point in time, I'm not aware of whether -- now, defense

23 representation, she is not going to refer to it, she is not

24 going to testify to it, therefore, it is irrelevant.

25       If she does, then I think both sides need to be

1  prepared on the question of if there is an attorney-client

2  privilege or a work product privilege -- and I don't have it

3  in front of me, so I'm not going to rule on it -- as to

4  whether that might be waived during the course of the trial

5  when a witness refers to a document that would otherwise be

6  protected by the attorney-client privilege or the work product

7  privilege.  So --

8        MR. MARDEROSIAN:  Your Honor, what -- excuse me.

9        What if she says something that's contrary to her

10  deposition testimony she said in that report?  That's an

11  impeachment document.  This is why I felt that she should have

12  been designated as an expert, so I had a report.  But the

13  Court has ruled and I understand that ruling.

14        But I feel that we should see that stand-alone

15  analysis that she titled it in her deposition, so that I can

16  make sure that she didn't previously say something different

17  than what she said in her deposition, and what I anticipate

18  she will say here in the course of the trial.

19        THE COURT:  I understand.  But again, it is somewhat

20  speculative as to whether or not a document which apparently

21  she is not going to refer to at trial, and will not rely upon

22  in any lay opinion or her testimony, might contain

23  information.  It is possible, I suppose, to say, well, the

24  reason they are not going to use it is it contradicts

25  something or the other.  I don't have that information.  I'm

1 | not going to speculate.

2 |       But, obviously, during the course of her testimony,

3 | you can always, you know, ask for a motion for

4 | reconsideration, and with respect to -- and I will take this

5 | as a motion by the plaintiff's side for disclosure of this

6 | analysis of the timesheets that she has done.

7 |       Right now, I'm not going to require it to be

8 | produced, but obviously, it can be.

9 |       And I will say this.  Both sides can be vigorous

10 | advocates for each of your respective clients, but during the

11 | course of the trial, if I find that there is some information

12 | that probably should have been disclosed, and the other side

13 | says, "Look, I need some time," I will give you the time.

14 |       And if that means that we drag this trial out an

15 | extra day or two, we stand in recess or whatever, or I say --

16 | it's a Thursday and this information has come forward -- I

17 | will say, "Okay.  This witness is not going to testify for the

18 | rest of Thursday, even though this witness was going to be

19 | gone by Friday.  This witness is coming back the following

20 | Tuesday."  And the other side is going to have from Thursday

21 | to Tuesday to do whatever investigation is necessary.

22 |       So it's up to you folks.  I mean if you want to do

23 | your trial and leave me out of it, then you need to cooperate

24 | with each other.  If you don't, and you want to just hold the

25 | cards close to your vest, that's perfectly fine with me.  I'm

1   okay with that.  The only thing I will control, of course, is

2   the course of the trial.

3           If that means there has to be some delays, or

4   whatever, to accommodate a party who has not received

5   information that I find they should have received, then we

6   might drag this case on a little bit longer than you

7   anticipate.  So keep that in mind.

8           Okay.  Second motion in limine by plaintiff, to

9   exclude the, quote, 2000 Memorandum and the 2002 Memorandum,

10   which are Defendant's Exhibits 72 and 73, respectively.

11           Plaintiff, anything further on that motion?

12           MR. MARDEROSIAN:  No, your Honor.

13           THE COURT:  Defense?

14           MR. VASSEGHI:  No, your Honor.

15           THE COURT:  Okay.  Now, the thing that I didn't see,

16   and defense side can correct me if I'm wrong, but in terms of

17   Wonderful Citrus' decision to terminate Mr. Jordan, I don't

18   see where either side has indicated that the 2000 and the 2002

19   Memorandum, or the information contained in there, were part

20   of that determination process.

21           I can understand the defense position that that may

22   be evidence of some prior incidences with Mr. Jordan, but

23   again, we are starting to get into specific acts and 404, Rule

24   of Evidence 404.

25           So what I'm going to do is I'm going to grant the

1    motion to exclude the 2000, 2002 Memorandum for proving

2    character.  But if Mr. Jordan contends that he was a good

3    employee throughout, et cetera, then there is a possibility on

4    a motion for reconsideration, whether or not that information

5    can be used to impeach.  But, again, that's a possibility, but

6    not, at least at this point in time, that I'm inclined to do

7    so.

8            The third one is to exclude evidence that Jordan was

9    asked to take a polygraph test, and declined.

10           Plaintiff, anything further on that?

11           MS. COHEN:  No, your Honor.

12           THE COURT:  Defense?

13           MR. VASSEGHI:  No, your Honor.

14           THE COURT:  Okay.  Polygraph tests, or at least the

15   offer of a polygraph test, can be relevant in this case, if,

16   for some reason, defense had based its termination decision to

17   some extent on the refusal to take the test.  But I haven't

18   seen enough evidence for me to determine that defense based

19   its termination in any manner on the decision regarding the

20   polygraph test.

21           So at least at this point in time, I'm going to grant

22   the motion.  If evidence comes out that a polygraph test was a

23   factor in the termination decision, it is possible that I

24   might allow it with a limiting instruction.

25           There are obviously reasons why people don't want to

1  take a polygraph test.  Certainly, distrust of polygraph

2  exams, in general.  Distrust of the other side offering their

3  polygraph examiner to conduct the test.  There could be

4  medical issues involved.  But that goes to the 403 issues,

5  which I'm not going to get close to at this point in time.

6          Okay.  Motion in limine number 4, to exclude Defense

7  Exhibit 115, the wine seller's testimony video.

8          Anything further by plaintiff on that motion?

9          MS. COHEN:  No, your Honor.

10         MR. VASSEGHI:  No, your Honor.

11         THE COURT:  In this case, I will say this.  As far as

12 video, YouTube, whatever, it is arguably relevant in part with

13 respect to plaintiff's lifestyle or income, et cetera, et

14 cetera.

15         But the fact that someone has seen a video, or

16 whatever, is of marginal relevance, if at all.  And so I am

17 going to grant the motion to exclude the video.

18         Okay.  Motion in limine number 5, excluding

19 evidence/argument pertaining to Jordan's wealth.  A little bit

20 more detail than the video.

21         Plaintiff's position, anything further?

22         MR. MARDEROSIAN:  I don't have anything further to

23 add than what was in the motion, your Honor.  Let me say this.

24 The fact that Mr. Jordan may have a nice home or a cabin at

25 Shaver Lake, I think goes to the heart of this.  And it

1   implies that for those reasons, he shouldn't have been, you

2   know, that for those reasons, it is okay to terminate him or

3   he hasn't been damaged by the termination.

4         And as I have stated, it opens up a whole can of

5   worms over issues concerning his debt load, the debts that he

6   faces, and a lot of information that may go well, well beyond

7   what is relevant here.

8         And I think all of this falls squarely within a 403

9   objection, your Honor, as being not only irrelevant pursuant

10  to 401, but 403, that the probative value of it is

11  significantly outweighed by not only the prejudice, but the

12  time-consuming element of going into his so-called wealth or

13  lack thereof.

14        Now, I realize the same may apply in regard to

15  Mr. Resnick, the owner, but I think since they are a

16  defendant, there are different rules that may apply there.

17  But at least in regard to the plaintiff's wealth or

18  implications of his wealth, I believe that it should be

19  excluded, as I have stated in the motion, your Honor.

20        THE COURT:  Defense?

21        MR. VASSEGHI:  Your Honor, we are not going to be

22  introducing this evidence for purposes of showing that

23  Mr. Jordan stole from the company and is, therefore, wealthy.

24  That is not the point.

25        The point is after the termination, plaintiff is

1    arguing that Mr. Jordan has not been able to find a job.  And

2    our position is, well, he has been working on his own farm.

3    It's been producing income.  And, therefore, that shows that

4    his continued level of lifestyle pre and post termination are

5    one in the same.

6            And, therefore, it goes to the damages.  It goes to

7    mitigation.  And, therefore, that's why evidence of his

8    financial status is actually extremely relevant.

9            THE COURT:  All right.

10           MR. MARDEROSIAN:  Just a quick comment in rebuttal,

11   if that's acceptable, your Honor.

12           THE COURT:  Sure.

13           MR. MARDEROSIAN:  First of all, working on his own

14   farm, and Mr. Vasseghi said, "and making money," he hasn't

15   made any money.  Anybody living in the Central Valley,

16   knowledgeable about the citrus industry this year, it is clear

17   he is not making any money from the 70 acres that he farms.

18           These things, these issues go to irrelevant matters.

19   I think that the jury should know what Wonderful Citrus is,

20   what the Wonderful companies are.  I know that there are

21   limits in that regard.  I'm not looking for a ruling that, you

22   know, limits here, but gives me complete, you know, a wide

23   scope in terms of the wealth of the defendant or the

24   defendant's owner.

25           But if we start here, this certainly is most

1    irrelevant, your Honor.  And the argument that, "Okay.  It is

2    okay for us to terminate him because he can just farm his own

3    ranch," I think is an issue that the jury is going to have to

4    deal with.

5         But to imply that he is some wealthy man because he

6    has a nice home and a cabin at Shaver.  If you saw the

7    pictures of the cabin at Shaver Lake, I think it is clear to

8    see that that's not the case.

9         MR. VASSEGHI:  Can I say one more thing?  The issue

10   of Mr. Jordan's cabin in Shaver Lake, it is going to be raised

11   during the trial not for purposes of the fact that he owns a

12   cabin at Shaver Lake, but for the purpose of whether there was

13   any work done on the Shaver Lake home, which was being built

14   while Mr. Jordan was an employee of Wonderful Citrus, and

15   whether any employees of ours did anything to contribute to

16   that, the building of that cabin, at the expense of Wonderful

17   Citrus.  So that -- it is relevant for more than just the mere

18   fact of its existence, but how it came into being is relevant

19   to this case.

20        MR. MARDEROSIAN:  Well, I don't mean to belabor it,

21   but bear with me on this, your Honor.  As the Court knows,

22   they have dismissed their cross-complaint seeking damages for

23   this.  There is absolutely no evidence in the case from all

24   the depositions that I have taken -- even their own

25   investigator admitted they have no evidence that Mr. Jordan

1   used any labor that Wonderful Citrus paid for to work at his

2   Shaver Lake cabin.  I mean there is no evidence of that.

3          And if they want to go down that path because it is

4   part of their investigation, I understand that.  It is going

5   to go to the whole issue of malice and where they were going

6   with the investigation.

7          But so long as that's not shown as some wealth

8   factor, then we will just see where it goes.  But I think they

9   have already admitted, and I have represented to the Court,

10  they have already admitted, they have no evidence that he used

11  any labor for that purpose.  There was rumors of that, but

12  they never were able to back any of it up.  That's why they

13  ultimately dismissed their counterclaim.

14          THE COURT:  Okay.  Well, I'm going to do the

15  following.  In terms of wealth, nice lifestyle, is it -- there

16  is some relevance, which I will get to in a moment, but just

17  to have evidence of a nice home and other properties is not

18  particularly relevant.

19          And then we do get into the issue of, okay, "Where

20  did I get this?"  And it could well be that he was earning

21  enough from his work at defendant's properties to be able to

22  afford this.  But I don't know.

23          The only thing that would be really relevant, that

24  would survive 403, is if, in good faith, the evidence -- part

25  of the evidence in terms of defendant's investigation of the

1   possible grounds for termination, which would be, allegedly,

2   the use of company resources, that might be something.

3          But, again, I don't know who is going to testify, or

4   to what extent, that his properties was part of the reason for

5   investigating or following up when someone said, "Well, okay,

6   he is doing this.  He is using company resources.  Well, okay.

7   That was a factor.  And a minor factor was what we learned

8   about his home and his properties was one other piece of the

9   information that we utilized to realize that we had to do an

10  investigation with respect to use of company property," et

11  cetera.

12         But only to that limited extent and only if that was

13  a part of the investigation.  If it wasn't, then it is truly

14  of marginal relevance, and would be excluded under 403.

15         So at this point in time, I will go ahead -- just for

16  clarification, I'm going to go ahead and grant the motion,

17  with the understanding that I'm not aware of exactly what's

18  going to be testified to with respect to the basis for

19  defendant doing the investigation.

20         If part of it was looking at his, quote, wealth and

21  lifestyle, and that's factored in, and there is some evidence

22  of that in terms of internal reports or whatever, that that

23  was a legitimate part of their investigation process, it would

24  be admitted for that limited purpose only.

25         But again, that has to come through the testimony of

1   the witness.  And if it turns out that that wasn't a factor,

2   then it wouldn't be admissible as of marginal relevance, if at

3   all.  And under 403, would not be admissible.

4          Number 6, exclude philanthropic acts by Wonderful

5   Citrus or Stewart Resnick.

6          Plaintiffs?

7          MS. COHEN:  No, your Honor.

8          MR. VASSEGHI:  No, your Honor.

9          THE COURT:  In terms of timeframe, it is my

10  understanding that -- and I'm not sure if defense is going to

11  attempt to admit this, but basically, as I understand the

12  philanthropic acts, as it relates to Mr. Jordan, are

13  scholarships to his children.  And I don't know if there was

14  anything else that was provided to him.

15         And the relevance, if at all, would be to negate any

16  animus or malice towards him if they were treating him really

17  well up until the time of the alleged investigation,

18  determination of termination.

19         Anything else by defense side on that?

20         MR. VASSEGHI:  Your Honor, this is more going to be

21  part of background information just for the jury to have a

22  clear understanding of who Wonderful Citrus is, what they do,

23  what they do for their employees.

24         You know, I suspect that plaintiff is going to paint

25  Wonderful Citrus as a not-so-nice employee who did terrible

1    things.  If that's their position, we need to be able to at

2    least rebut that to the extent that we can show what it is

3    that we do as a company for our employees and their community.

4         It is going to be a minimal and brief statement by

5    Mr. Krause, the President of Wonderful Citrus.  So it is going

6    to take very little time, and we are going to spend no more

7    than a couple minutes on the issue.

8         THE COURT:  At least at this point, from what I have

9    heard, I'm going to go ahead and grant the motion because just

10   a general "good employer" sort of thing is really not

11   relevant.

12        I mean you could have really good people.  I have had

13   cases of really good police officers who make one mistake, or

14   a really good employer who makes one mistake, or whatever.

15   Good driver that makes one mistake, or whatever.

16        So this is really more character evidence.  And so at

17   this point in time, if plaintiff attempts to introduce

18   evidence or introduces evidence that "Wonderful Citrus or the

19   owner or management are really horrible people and they are,"

20   whatever, then I will certainly entertain a motion for

21   reconsideration for rebuttal or impeachment purposes to show,

22   you know, the good side of defense.

23        So just keep that in mind.  And I will consider a

24   motion for reconsideration depending on how plaintiff's side

25   proceeds in a characterization of either the company or owners

1    or management of the company.

2            MR. MARDEROSIAN:  Your Honor, if I could just comment

3    just briefly?  And I'm sorry.

4            THE COURT:  Sure.

5            MR. MARDEROSIAN:  Keep in mind, the defense, talk

6    about painting a bad picture of someone.  Clearly, a lot of

7    their case is Mr. Jordan is a bad person, is a bully, creates

8    a hostile work environment, and all of that.

9            So, you know, for them to be concerned about how I

10   might describe them as employers, let's not forget that their

11   whole case appears to be that he is a bad guy, and that was a

12   reason to fire him, one of the reasons for that.

13           So I would suggest to the Court, your Honor, that we

14   follow the Court's ruling on this and just see where the

15   evidence goes so that the Court can determine whether or not

16   either party opened the door that goes beyond the spirit of

17   what the Court is directing us here in this ruling.

18           THE COURT:  Sure.  We need to keep in mind, what we

19   really have, bottom line, is that the plaintiff is saying that

20   defendant is malicious, et cetera, et cetera.  And the defense

21   is saying, "Well, we terminated him because, you know, he was,

22   quote, stealing, or making inappropriate comments."

23           So this is not a nice-guy nice-guy sort of a thing.

24   This is something where both sides are making very serious

25   accusations against the other side.  So I understand that.

1    And that's going to be a part of --well, it is going to be a

2    majority of the case, is saying bad things about each other,

3    because that's the crux of the claim for defamation and that's

4    the crux of why he was terminated.  So that's going to come

5    out.  That's the whole case.

6            MR. VASSEGHI:  Your Honor, can I get a point of

7    clarification on this issue?

8            THE COURT:  Sure.

9            MR. VASSEGHI:  Specifically, you know, the fact that

10   Wonderful Citrus was providing scholarships to Mr. Jordan's

11   children while he was an employee there, it negates Wonderful

12   Citrus' malice to the extent that plaintiff is going to make

13   such an assertion.

14           So is it the Court's position that we cannot even

15   refer to the fact that this occurred, that Wonderful Citrus

16   provided these benefits to Mr. Jordan?

17           THE COURT:  Well, I assume that Mr. Jordan is going

18   to make that contention, malice, et cetera.  And so that's

19   where your motion for reconsideration comes in, because then

20   on the defense side, for that allegation would be the

21   contention, if it is correct -- and again, the timeframe is

22   important here -- is when were they giving scholarships.

23           It is not to show that Wonderful Citrus is good to

24   their employees in general.  It is not general character

25   issue.

1          It is more specific, that if an allegation is made

2     that Wonderful Citrus really had it in for Mr. Jordan, that

3     these reasons for terminating were pretextual, that,

4     et cetera, that then I could see some relevance with respect

5     to, "Oh, wait a minute.  We didn't have it in for Mr. Jordan.

6     In fact up until 2015, we were providing -- voluntarily

7     providing scholarships," and maybe some other things they did,

8     "for Mr. Jordan," or his family specifically.

9          But not just a philanthropic company, in and of

10     itself, because that's character evidence which really isn't

11     relevant in this particular case with the claims and defenses.

12          MR. VASSEGHI:  Understood.  Thank you for the

13     clarification.

14          THE COURT:  Number 7 is to exclude prior employment

15     handbooks, policies and agreements between Mr. Jordan and any

16     of the Wonderful Citrus' predecessor companies.

17          Plaintiff's position, anything further?

18          MR. MARDEROSIAN:  I don't have any further comment on

19     this, your Honor.

20          THE COURT:  Defense?

21          MR. VASSEGHI:  Your Honor, this is an interesting

22     motion because Mr. Jordan is going to be claiming that he has

23     been an employee of our company for 27 years.  That is

24     completely in contradiction to their position in this motion.

25     What they are trying to do is they are trying to cut off

1    anything that happened when there was a name change from

2    Paramount Citrus to Wonderful Citrus.

3         If that's their position, they can only say that

4    Mr. Jordan has been with us for two years before he was

5    terminated.  I don't understand why there is an arbitrary

6    cutoff of any agreements that Mr. Jordan entered into prior to

7    the name change.

8         And it goes to the issue of whether Mr. Jordan is an

9    at will employee.  He signed an offer letter for his position

10   as -- for his position as Director with Paramount Citrus,

11   which stated he was an at will employee.  He signed a handbook

12   with Paramount Citrus, which stated he was an at will

13   employee.  The handbook for Wonderful Citrus and Paramount

14   Citrus are absolutely identical.  The only word that's

15   different between those handbooks is "Paramount" was

16   substituted for "Wonderful."

17        So for him to now take the argument, make the

18   argument that somehow these agreements are not relevant,

19   certainly doesn't pass muster.

20        Secondly, Mr. Jordan is claiming that there were

21   these alleged verbal agreements between him and other --

22   another employee, presumably Mr. Carmen, who was his boss,

23   that was saying that he could stay there as long as he wants.

24        We don't know when these statements were made.  If

25   they were made when it was Paramount Citrus, the agreements

1   that he entered into with Paramount Citrus are completely

2   relevant.  Not only are they relevant, they are actually

3   completely undermine his claim, and we would be moving for a

4   directed verdict on that issue.

5          So there was literally nothing that changed from

6   Paramount to Wonderful.  It was a name change.  Mr. Jordan had

7   the same salary, he had the same position, he had the same

8   responsibilities.

9          So to come now and say that we want to exclude

10  everything that happened prior to 2015 because it was a name

11  change, simply makes no sense.

12          MR. MARDEROSIAN:  Just a brief comment, your Honor,

13  if I may.  First of all, at the time of termination of

14  Mr. Jordan, the company was Wonderful Citrus Packing LLC.  At

15  the time of termination, Mr. Jordan was an employee of that.

16          One of the exhibits is the Wonderful employee

17  handbook.  It clearly expresses that the handbook supersedes

18  all prior handbooks.  This was the handbook that controlled at

19  the time of Mr. Jordan's termination.  Representations by

20  Mr. Krause in this handbook about Wonderful and how they treat

21  their employees is as expressed and in existence at the time

22  of his termination.

23          Prior materials, prior handbooks -- when I say "prior

24  handbooks," have no relevance under 403.  Why should we go

25  through the current handbook that existed at the time of his

1   employment and still go through earlier handbooks if they are

2   identical, as Mr. Vasseghi represents?

3          Again, under 403, it is going to be quite

4   time-consuming if we have to get into all of that.  The

5   company purposely changed its name to Wonderful Citrus.  All

6   of the actions that are alleged to be wrongful in this case

7   occurred during the course of time that the company was named

8   that.  The president who was involved in directing the

9   investigation, issued the defamatory e-mails, was an employee

10  of Wonderful Citrus.  Everything focused on Wonderful Citrus.

11         Going earlier, to earlier names, earlier handbooks is

12  going to take up a lot of unnecessary time.

13         MR. VASSEGHI:  Your Honor, two things.  The fact that

14  Mr. Jordan was repeatedly signing agreements that he was an at

15  will employee goes to his state of mind throughout his

16  employment with us as to whether he knew he was an at will

17  employee or not.

18         Second of all, I would agree with Mr. Marderosian

19  that the -- the newer, more updated handbook would be relevant

20  versus an old handbook if, in fact, a new handbook was

21  markedly different or different at all.  They are the exact

22  same handbook.

23         The reason why Mr. Jordan doesn't want the jury to

24  hear that he signed the 2012 handbook, which was a Paramount

25  Citrus handbook, is because he signed that handbook,

1   acknowledging receipt, and acknowledging that all of the terms
2   in that handbook applied to him.
3        Now, if he signed that earlier handbook, but not the
4   subsequent one, but the terms are actually identical in both
5   handbooks, that's highly relevant.  And if the jury doesn't
6   hear that, they will be left with the impression that these
7   were completely new terms that Wonderful Citrus put out that
8   Mr. Jordan didn't know anything about because he didn't sign
9   it.  The truth is that both handbooks are the same, and he
10  signed one, not the other.
11       MR. MARDEROSIAN:  Here's where the 403 issue comes in
12  then, your Honor, now that counsel has been specific in that
13  regard.  The HR department did not require Mr. Jordan to sign
14  the Wonderful Citrus handbook.  He was an employee of
15  Wonderful Citrus.  He received his checks from Wonderful
16  Citrus.  He was subject to the terms of the handbook -- that's
17  come out during the discovery of this case -- the Wonderful
18  Citrus handbook.
19       HR, by the way, was left out of this investigation
20  completely, but that's a whole different issue.  But in this
21  case, there was an existing HR Department.  Mr. Jordan was
22  subject to the Wonderful Citrus guidelines set forth in that
23  handbook.  That's all that's been discovered during the course
24  of this case, that those rules are the rules that applied
25  pursuant to his employment.

1    At no time, did the defendants contend that an

2  earlier signed handbook controlled over the existing handbook.

3  If they didn't require a signature for whatever reason, so be

4  it.

5    But under 403, that's going to open up a lot of

6  unnecessary issues when we -- when the facts are he was an

7  employee of Wonderful Citrus at the time of this employment.

8    MR. VASSEGHI:  Your Honor, can I make one final

9  point?

10    THE COURT:  All right.

11    MR. VASSEGHI:  The allegations against Mr. Jordan are

12  not necessarily limited to what happened between 2015, when

13  the name change occurred, and 2017, when he was ultimately

14  terminated.  His actions went prior to that date.  And that is

15  why the policies of the earlier handbook are relevant, because

16  they applied to him.

17    He was, as far as defense is concerned, he was taking

18  action which was in contraversion to the policies of the

19  earlier handbook which he signed back in 2012, so that's why

20  it is irrelevant under 403.

21    MR. MARDEROSIAN:  That's absolutely, your Honor, not

22  correct.  Every action that they are claiming that led to his

23  termination -- and there is nothing in writing that they

24  have -- but is all we have are the two e-mails issued by

25  Mr. Krause, the President, on November 1, 2017, before

1   Mr. Jordan was even formally told that he was being fired in a

2   Starbucks parking lot, by the way, but all of those reasons

3   for his termination are set forth there.  There is nothing

4   else in writing.

5           For counsel to say that he was fired for actions that

6   occurred when he was working under the Paramount name, there

7   is absolutely no evidence of that.  That's never been

8   contended, and there is no evidence of that at all.

9           In fact, the evidence is when Victor Loera spoke to

10  Lisa Krause, the President's wife, it was in the summer of

11  2017.  That led to an investigation that -- an alleged

12  investigation that led to Mr. Jordan's termination formally on

13  November 3, 2017.

14          Nothing about anything when he was an employee of

15  Paramount Citrus.  In fact, all his performance reviews and

16  evaluations when he was working under the Paramount name are

17  all exemplary.

18          THE COURT:  All right.

19          MR. MARDEROSIAN:  I think, if I could just conclude

20  with this.  They stated that Wonderful Citrus' executive

21  stated -- I kept asking him, "Why didn't you state anything in

22  writing to give Mr. Jordan knowledge of why he has been

23  terminated?"

24          "It is not our policy," they said.  "It is not our

25  policy.  We just give him notice that he is out.  He is being

1    separated."

2         Well, now, they should not benefit from the fact that

3    they played those cards close to their vest, that they don't

4    want employees to know specifically why they are being

5    terminated, and they should not now benefit from that by

6    relying on some earlier handbook or earlier conduct, as

7    Mr. Vasseghi says.

8         We have no knowledge, other than testimony under oath

9    in this case, as to whether or not that statement that counsel

10   made is even true.

11        MR. VASSEGHI:  Your Honor, the agreements -- this

12   issue is not limited to handbooks.  There are agreements

13   signed by Mr. Jordan when he was a Paramount Citrus employee

14   that he signed which said he was an be at will employee.  That

15   goes to Mr. Jordan's state of mind throughout the 27 years

16   that he was there.

17        If we are precluded from introducing that evidence,

18   that's going to be highly prejudicial.  That's the very

19   evidence we need to show Mr. Jordan's state of mind during his

20   employment there.

21        I don't understand how it can be arbitrarily cut off

22   at a point in time simply because there was a company name

23   change.

24        MR. MARDEROSIAN:  I don't know what state of mind we

25   are talking about.  Mr. Jordan denies stealing, denies being a

bad guy.  They claim that he was, and that was the reason why
they terminated him, according to what Mr. Krause testified to
and was set forth in the e-mails.  These prior agreements,
this is all new.  There is no indication of that.

They should not be allowed to benefit from not
notifying the employee of the specific reasons for their
termination by coming here to trial and now claiming it was
because of some agreement that he signed five or six or ten
years ago.  That's completely unfair.

MR. VASSEGHI:  Your Honor, I think Mr. Marderosian is
missing the point.  The point is that they have a claim for
breach of express oral agreement and breach of implied
contract.

So if Mr. Jordan was an at will employee, and that
the policies throughout those 27 years were that you are an at
will employee, and that you cannot have any such modifications
to your at will employment, then those agreements that he
signed throughout his 27 years are highly relevant and they
are highly probative.

This has nothing to do with the policies that were in
place at the time of his termination.  That's not what we are
talking about.

We are talking about the claims that Mr. Jordan has
raised in his complaint about whether or not there were oral
agreements or not.  And all of the agreements that he signed

1   under Paramount Citrus speak specifically to that issue.

2          MR. MARDEROSIAN:  My final comment, your Honor.  He

3   is talking about oral agreements?  Mr. Jordan orally agreed to

4   comply with the Wonderful Citrus handbook, and that handbook

5   says it supersedes all prior handbooks.  This is the document

6   that controls.

7          THE COURT:  All right.  Okay.  There are two claims

8   that are relevant here:  The breach of express oral contract

9   not to terminate employment without good cause, and the breach

10  of implied contract of continued employment not to terminate

11  without good cause.

12         As I understand the defense contention, one of the

13  defense contentions is that there is no such agreement, that

14  he was an at will employee throughout.

15         And so I do find that, obviously, the whole continuum

16  of Mr. Jordan's employment with the various iterations of the

17  ultimate corporation are relevant on the issue of his status

18  as an employee, whether or not he was an at will employee.

19         So I will deny the motion to exclude evidence of the

20  prior -- basically, it would be all documentation relating to

21  employment, including the employee handbook, policies, and

22  agreements, between Mr. Jordan and any of the Wonderful

23  Citrus' immediate predecessor companies.

24         Motion in limine number 8 is exclude Defendant's

25  Exhibit 132, 133 and 134, acreage maps, summary, and grower

1 pool statements.

2          Plaintiff's position on that?

3          MS. COHEN:  Submit it, your Honor.

4          THE COURT:  Defense?

5          MR. VASSEGHI:  Nothing more, your Honor.

6          THE COURT:  It does appear the documents were not

7 timely disclosed.  Rule 37(c)(1) states:

8          "If a party fails to provide information or identify a

9          witness as required by 26(a) or (e), the party is not

10          allowed to use that information or witness at trial

11          unless the failure was substantially justified or is

12          harmless."

13          In this case, I do find that it does not appear that

14 there is justification for not disclosing that information.

15 It is prejudicial to Mr. Jordan.  He was not able to conduct

16 discovery, at least during the official discovery phase.  And

17 at least at this late stage, it is difficult, if not

18 impossible, for Mr. Jordan to cure any prejudice.

19          And so in this case, I do find that there is no

20 substantial justification or harmlessness.  Defense has not

21 met its burden, and I will grant the motion to exclude those

22 documents.

23          If the parties agree to further -- as I mentioned at

24 the pretrial conference, I don't have any problem with

25 continuing informal discovery that the parties agree upon,

1   whether it deals with documents or witnesses or both.  But at

2   this point in time, the formal discovery process is closed.

3        Number 9, motion in limine number 9, to exclude

4   expert opinions that exceed the scope of those set forth in

5   the expert reports and depositions.

6        Defense is not opposed to that.  And basically, as

7   the parties understand and agree, this aspect is governed by

8   Federal Rule 26(a)(2)(B)(i), which does require expert reports

9   to contain a complete statement of all the opinions of the

10  witness, all the opinions a witness will express, and the

11  basis and the reasons for them.

12       So I will go ahead and grant the motion.  That

13  applies to experts on both sides.

14       Number 10, exclude expert opinions from any witness

15  not designated as an expert.  And, again, this deals with

16  expert witnesses on this under Federal Rules 26 and 702.

17       Again, this only deals with the expert witness

18  category.  And so I will go ahead and just indicate, I will

19  grant the motion that applies to expert witnesses on both

20  sides, governed, again, by Rule 26 and Rules of Evidence 702.

21       And of course, I have already dealt with motion in

22  limine number 1 with respect to Ms. Desaulniers as far as her

23  testimony as a lay witness.

24       Number 11, exclude nonparty witnesses from the

25  courtroom except for Jordan's spouse, Chung Jordan.

1     And I will go ahead and grant that motion.  Let me

2     just indicate, I am going to grant in general a motion to

3     exclude witnesses.  I will leave it to counsel to make sure

4     that there are no prospective witnesses present during the

5     testimony of the witnesses.

6     If either side agrees or does not disagree that

7     certain witnesses can be present in the courtroom, that's fine

8     with me, but I will leave it to you folks to police the

9     audience area to make sure that prospective witnesses aren't

10    present.  So this is a general motion to exclude witnesses

11    granted as to both sides.

12    As a procedural matter, once a witness has concluded

13    his or her testimony, I will turn to each side and ask if you

14    wish this witness reman subject to recall.  If you don't, I

15    will excuse that witness, and that witness is excused from all

16    further proceedings from this court, and would not be subject

17    then to be required to come back into court, absent either

18    voluntarily coming back or being subpoenaed.

19    If either party wishes the witness to remain subject

20    to recall, I will send the witness out, and I will leave it to

21    whoever initially called the witness to make sure that that

22    witness is available when the other side or that same side

23    wishes to have that witness come back.

24    The only caution with respect to having witnesses

25    subject to recall, I know sometimes you are not quite sure,

1   and you really don't want to release a witness.  Just keep in

2   mind the convenience of the witnesses.  Just make sure you

3   don't have somebody hanging around here for a week and finally

4   realize, "I really don't need that witness anymore anyway."

5   So use your discretion on that.

6            But again, that's just the standard procedure for me.

7   I will ask each witness to remain subject to recall, and then

8   I will respond accordingly.

9            Once a witness has been excused for all purposes,

10  they are free to leave, they have no further obligations via

11  the Court.  If they wish, they can come in and observe the

12  balance of the trial or any portion of the trial, if they

13  wish.  They become ordinary spectators, just like anybody

14  else.

15           Number 12 is to exclude evidence of settlement

16  discussions and overtures.  No opposition.  I will grant that

17  motion.  And, obviously, Federal Rule of Evidence 408 is

18  implicated here, so the motion is granted, and that would

19  apply to both sides.

20           Those are the plaintiff's motions in limine.

21           Anything further with respect to plaintiff's motions

22  in limine?

23           MR. MARDEROSIAN:  No, your Honor.  Thank you.

24           THE COURT:  Anything further on the plaintiff's

25  motions in limine, defense?

1      MR. VASSEGHI:  No, your Honor, thank you.

2      THE COURT:  Those are the rulings of the Court and

3  become the law of the Court, subject to a motion for

4  reconsideration.

5      We will go ahead and start up on the defense motion,

6  and take a break at 3:00 o'clock.

7      The first defense motion, to exclude evidence of the

8  DUI conviction of Wonderful Citrus' expert Beth De Lima.

9      Anything further by defense side on that motion?

10     MR. PECHT:  No, your Honor, unless there is some

11 specific questions.

12     THE COURT:  Plaintiff's side?

13     MR. MARDEROSIAN:  Your Honor, in this case, obviously

14 the defense is taking the position that what we allege to be

15 the defamatory e-mails referencing the alleged conduct of

16 Mr. Jordan and the effect that has had on him in the Central

17 Valley citrus industry and his ability to receive job offers

18 or find comparable employment, or any employment, for that

19 matter, within the citrus industry, is a very relevant issue

20 in this case.

21     And when I took the deposition of Ms. De Lima, and

22 discovered the felony conviction, as we have described in our

23 papers, I noted that it wasn't on her website, it wasn't on

24 her CV.  And I specifically asked her why not, if calling

25 Mr. Jordan and publicizing that he is a crook, so to speak,

obviously, you'd feel the same way.  Of course, she disputed that with me, but that is the reality.

She hasn't put any disclaimer on her website, she hasn't put any type of disclaimer on the CV.  Being forthright about the fact that she is a litigation expert, as she testified to, then any expert would know a felony conviction is very relevant, certain felony convictions.

And I think it goes to the issue of the credibility of her testimony on the effect of similar information that it has on finding comparable employment in the industry.

THE COURT:  Anything else?

MR. PECHT:  Yes, your Honor.  I would just state simply that it falls under Rule 609.  As far as relevance, plaintiff can simply ask that witness if a published accusation of theft would impact her opinions in this case, not necessarily to impugn her character for a first offense DUI, which does not relate to the character or truthfulness of this witness.

THE COURT:  All right.  In this case, I am going to grant the motion.  It does appear that in terms of her enhancement, apparently what she admitted to in her plea of no contest was the GBI enhancement.  It's Penal Code section 1192.7(c)(8), which qualifies as a strike, but it does not enhance her sentence.

And it appears that the conviction, California

1   Vehicle Code section 23513(b) [sic] is not more than a year.

2   So it does not qualify under 609(a)(1)(A) as a -- punishable

3   by imprisonment for more than a year.  So it doesn't seem to

4   fit within the qualifications of 609, and there is no case

5   authority for the proposition that it does go to truthfulness

6   or veracity.  That is the conviction itself.

7           I understand what the plaintiff's side is saying, but

8   I think under 403, it is far more prejudicial than any

9   probative value as far as either 609 or whatever understanding

10  she might have as far as the seriousness of that.

11          So I am going to grant that motion.

12          Number 2 is to exclude evidence that defendant's

13  rebuttal expert, Brad Schuyler, received a citation from the

14  California Board of Psychology for failing to timely complete

15  CLE [sic] requirements.

16          Anything further on behalf of defense on that motion?

17          MR. PECHT:  Submit on the papers.

18          THE COURT:  Plaintiff's side, anything?

19          MR. MARDEROSIAN:  No, your Honor.

20          THE COURT:  It does not appear, from what I

21  understand of his failure to timely complete the CLE

22  requirements, that that bears on his qualification or the

23  soundness of his expert opinions.  It is, under 403, would be

24  unfairly prejudicial, would confuse the jury as to what

25  significance that has in terms of credibility.

1          So under 403, I am going to grant the motion and

2     exclude that evidence.

3          Number 3 is to exclude Rhoma Young's undisclosed

4     rebuttal opinions and two opinions regarding malicious intent.

5          Further by defense?

6          MR. PECHT:  Your Honor, we would just submit on the

7     papers.  We believe it states the basis for the untimely

8     disclosure of Ms. Young's opinions.

9          THE COURT:  Plaintiff's side?

10         MR. MARDEROSIAN:  Your Honor, on this particular

11    motion, it is an issue of whether or not it is something new

12    or not.  And I believe that the Court first needs to hear that

13    testimony.  And there can be objections during the course of

14    the testimony, but before we conclude that her comments on

15    that are new, where, in her deposition, she directly denied

16    that they were new, she attached it to other portions of her

17    opinions, I would submit to the Court that that would be the

18    procedure to follow.

19         MR. PECHT:  If I may be heard?

20         THE COURT:  Yes.

21         MR. PECHT:  We have attached the entirety of

22    Ms. Young's expert report that was submitted to us.  It is a

23    20-page opinion, dealing with Wonderful Citrus'

24    pre-termination investigation.  She held herself out as an HR

25    expert, not a labor market analysis expert.

1      She, at her deposition, stated that two sentences of

2  her 20-page report had something marginally to do with labor

3  analysis.  The first sentence had nothing to do with

4  Mr. Jordan, it was a throw-away line.

5      The second one states the following:  "They had to

6  know this was going to negatively impact his ability to find a

7  comparable position in the industry."  And that is it.  It is

8  under a section relating to our investigation, not relating to

9  labor market analysis.

10     And yet at her deposition, she showed up with two

11  pages of bullet points and interlineations on a -- on her old

12  expert report that specifically say they were there to rebut

13  Ms. De Lima.

14     It was a surprise tactic that was meant to prevent us

15  from fully preparing prior to her deposition.  Counsel then

16  refused to produce her for an additional rebuttal deposition

17  at that deposition, several times on the record.  We submitted

18  all of that evidence with our motion and reply.

19     MR. MARDEROSIAN:  Again, that's incorrect.  That she

20  produced it at her deposition.  Obviously, counsel examined

21  her on that.  But she testified basically in her deposition

22  that she focused on the impact that this termination and how

23  he was terminated would have on his ability to find

24  employment.

25     So when she was commenting on that subject, and

1  referencing what Ms. De Lima had to say, she expressed

2  disagreement with that.  And not only did she -- if it was an

3  alleged tactic, this went beyond oral testimony, she actually

4  wrote out her remarks.  And they had it, and Mr. Pecht

5  examined her on it extensively at the time of her deposition

6  in -- it was just a few months ago.

7          So no surprise.  No tactic.

8          She felt that it was relevant in support of her

9  opinions.  And to add in there that she comments on, well,

10  Ms. De Lima said X, Y, Z, and I disagree with that, it is all

11  part of that subject matter of how they went about terminating

12  Mr. Jordan, how they went about defaming him, announcing to 3-

13  to 400 employees the reasons for his termination.  That's what

14  she was commenting on.

15          MR. PECHT:  And, your Honor, just very simply, this

16  was an HR expert on an investigation that was transformed into

17  a labor market analysis rebuttal expert.

18          I was at that deposition.  I did not have an

19  opportunity to review her opinions prior to the deposition.  I

20  did not have time to review those opinions with Ms. De Lima

21  herself.  Her scope of her opinion from her very own report

22  said:

23          "I was asked to look at the events leading up to the

24              termination of Mr. Jordan from his long-term

25              employer, Wonderful Citrus, including the

1            investigation, the terminated decision, and

2            communication about the termination, and how those

3            comported with suggested management practices."

4        If you look at the 20-page report, it is not dealing

5    with labor market analysis.  She admitted at her deposition

6    she conducted labor market analysis reviews and analysis that

7    were not disclosed until the very minute that she walked into

8    the deposition.

9        And there was no prior effort to reveal that to

10   counsel.  There was no -- and in fact, a e-mail from counsel

11   stated that there would be no experts that would be rebutting

12   Ms. De Lima.

13       So we were relying on that when we walked into that

14   deposition, and definitely were surprised to suddenly find

15   ourselves having a rebuttal witness and, furthermore, have

16   counsel inform us that he would not permit that witness to be

17   deposed as part of a rebuttal expert part of our case.

18       So we would submit on our reply and on our motion on

19   this one.

20       THE COURT:  In reviewing the information here, it

21   does appear that Ms. Young's report, the questions she was

22   posed, essentially:  Were the practices used by defendant

23   consistent with suggested management practices and the

24   company's own policies on how to effectively and fairly deal

25   with defined performance management and potential

discrimination-related issues; investigate performance and appropriate behavior in the workplace; and then communicate the findings.

There was some information, I agree, with respect to responding to Beth De Lima's opinions, but it does appear that Ms. Young's focus was on pre-termination activities at defendant company; specifically, the legitimacy of the investigation and determination, whereas, Ms. De Lima's focus was on post termination job opportunities in the Central Valley.

And so in this case, I do find that there was not sufficient disclosure under Rules 26 and 37 as far as rebuttal expert witnesses.  And so with respect to any rebuttal opinions about post termination litigation issues, securing employment, et cetera, I'm going to grant the motion.

With respect to opinions regarding the investigation and her opinion on whether or not there was a rational basis to terminate Mr. Jordan, I'm not going to exclude that.

And with respect to the intent of Wonderful Citrus in investigating and terminating Mr. Jordan, there is no preclusion from rendering that opinion.  Certainly, with respect to any opinions regarding the ultimate issues that the jury will determine, the only thing experts are precluded from doing is expressing an opinion on the ultimate issue of the law, not on facts.

1          So I'm not going to exclude those opinions.

2          All right, the next motion is to exclude -- this

3     would be the last one before we take a break -- exclude

4     cumulative opinion of Jordan's vocational expert, Rick

5     Sarkisian.

6          MR. PECHT:  Yes, your Honor.  Other than the motion

7     in reply that we already submitted, I do just want to state

8     that Mr. Sarkisian's own testimony at his deposition stated

9     that his opinion was irrelevant based on the fact that

10    Dr. Epperson had already testified at his deposition and in

11    his report that plaintiff is allegedly -- cannot be employed.

12         And so, therefore, this is a needlessly cumulative

13    expert.  He, essentially, has no further opinion other than

14    the fact that because Dr. Epperson has stated that he is

15    unable to work, that he has zero earning capacity.

16         This is not someone who has an independent

17    methodology.  In fact, he stated at his deposition that he did

18    not employee methodologies because he didn't need to because

19    of Dr. Epperson's opinion.

20         It is a waste of resources and an attempt to have the

21    same opinion come in through two experts to influence the

22    jury.

23         MR. MARDEROSIAN:  I think this is a standard basis

24    for the testimony of a witness like Dr. Sarkisian.  You call

25    Dr. Epperson first, you elicit his findings.  And then

1  Dr. Sarkisian comes in, without regurgitating it, but

2  testifies that he relied on the opinions of Dr. Epperson, and

3  then goes on and states his vocational opinions.

4       I am certain that this Court has seen that happen

5  many, many times in this courtroom.  Experts can rely on the

6  opinions of other experts in formulating their own opinions

7  within their realm of expertise.

8       THE COURT:  Okay.

9       MR. PECHT:  And your Honor, I agree with the

10  statement that experts can rely on the opinions of other

11  experts, but in this case, it is a wholesale adoption without

12  any further benefit to the jury.  And in fact, it does not

13  assist the jury, the expert essentially just stating the fact

14  that there is a zero earning capacity for someone who is

15  unable to work.

16       MR. MARDEROSIAN:  I'm lost here, your Honor.  I don't

17  know what representations are being made.  If Dr. Sarkisian

18  was asked in his deposition specifically all of the reasons of

19  what were stated by Dr. Epperson, that's one thing.

20       This Court will know whether or not Dr. Sarkisian is

21  just regurgitating.  And that's why this is the type of motion

22  that the Court should hear the direct testimony of

23  Dr. Epperson and Dr. Sarkisian before ruling, just based on

24  what counsel is representing, which I am not certain what

25  counsel is specifically referring to.

1          THE COURT:  All right.  Well, all right.  Let me say,

2    it is my understanding that Dr. Epperson is really focusing in

3    on the neuropsychological conditions that he just cannot be

4    employed or is unemployable.

5          Mr. Sarkisian talks about vocational abilities,

6    employment opportunities.  I can see where Dr. Sarkisian might

7    say, well, if he is unemployable under Dr. Epperson, then

8    maybe this is surplusage, but it is up to the jury to make a

9    determination on how much weight to give to either expert.

10         But they are not so duplicative that I would find

11   that Dr. Sarkisian's opinion or testimony should be precluded

12   or excluded as being duplicative.

13         And, obviously, if something should arise that the

14   parties wish to point out after Dr. Epperson testifies, I'm

15   certainly willing to hear a motion for reconsideration that

16   Dr. Sarkisian's opinions are going to be duplicative, period,

17   and that's okay.

18         But right now, I'm not going to exclude his opinion

19   on that basis, and I don't find his methodology to be so

20   unreliable that, under *Daubert*, that I would exclude him or

21   preclude him from testifying as an expert in that regard.

22         Obviously, it is up to the jury to make

23   determinations as far as the weight of the evidence as to any

24   witness, including expert witnesses.

25         So I'm going to deny the motion.  I will not exclude

1  the testimony of Mr. Sarkisian.

2         Let's take a 15-minute break, I will complete the

3  motions in limine and any other trial procedures.  We will

4  take a 15-minute break.

5         MR. MARDEROSIAN:  Thank you, your Honor.

6     (Recess)

7         THE COURT:  Okay.  Back on the record then on the

8  defense motions in limine.

9         MR. MARDEROSIAN:  Your Honor, if I may, before we

10  continue.  May I bring up an issue that I think needs to be

11  brought to the Court's attention right now, and I think the

12  Court can help us resolve it.

13         THE COURT:  Sure.

14         MR. MARDEROSIAN:  The primary investigator is a

15  gentleman by the name of Tom Goldman.  Mr. Goldman has worked

16  directly for Stewart Resnick, Craig Cooper, the head counsel

17  for the Roll Law firm, of which these fine lawyers are members

18  of.

19         He has done other investigations for Mr. Resnick and

20  Wonderful Citrus as well.  He worked directly with David

21  Krause.  There are significant e-mails between he and

22  Mr. Krause about this so-called investigation and about

23  Mr. Jordan.  Obviously, a very important witness.

24         I took his deposition.  I videotaped the deposition.

25  He was the chief investigator.  He wrote the investigative

1    report.

2           When we met with counsel on August 1, after the

3    pretrial, I said, "Are you going to produce Mr. Goldman?"

4           He refused.  He said, "Mr. Goldman is going to be out

5    of the country."

6           I said, "Well, then I'm left with the video."

7           "I'm going to object to the use of video," counsel

8    indicated.

9           Then I walked out of that room, and I hired a process

10   server and, guess what, they served Mr. Goldman.  I have him

11   under subpoena.  I subpoenaed him before he had a chance to

12   leave the country.

13          So during the course of the break, I asked

14   Mr. Vasseghi, I said, "Mr. Vasseghi, do you want to coordinate

15   the production of Mr. Goldman now that I have him under

16   subpoena or do you want me to deal directly with him?"

17          Both he and Mr. Pecht said he is not going to be

18   here, he is going to be out of the country.

19          I said, "That's not correct.  I have him under

20   subpoena.  He is a key part of the case.  I served him with a

21   subpoena.  We told you that he was going to be out of the

22   country."  I said, "It doesn't make any difference.  I

23   happened to serve him before he was able to leave the

24   country."

25          And so there is an issue, and counsel is now telling

1  me that they are not -- that he is not going to be here,

2  Mr. Goldman is not going to be here.

3       And I want to address the issue and get the Court's

4  comment on the fact that I have a very key witness that,

5  obviously, is controlled by the defense.  They represented him

6  at his deposition.  They represented him at his deposition.

7  And I don't want to call it game playing.  I don't want to go

8  down that path.

9       But I have him under subpoena, and I am going to call

10  Mr. Goldman in my case.

11       THE COURT:  Okay.

12       MR. VASSEGHI:  Your Honor, couple of things.  Prior

13  to the subpoena being issued, I informed Mr. Marderosian that

14  "Mr. Goldman would be present for trial; however, he is going

15  to be at a wedding in Israel until September 26th, and he can

16  appear in your case at that time."

17       So fact number one is that he is not unavailable for

18  the entirety of the trial.  He in fact will be here.

19       Two, Mr. Marderosian went ahead and issued a

20  subpoena, knowing full well that Mr. Goldman was going to be

21  out of the country on a pre-planned trip during the very time

22  that he issued the subpoena.

23       Three, the subpoena that Mr. Marderosian has issued,

24  I'm not even sure if it is valid.  I understand that the

25  individual is required to be within 150 miles of the court

1   which issued the subpoena, and Mr. Goldman is not.

2          So for these reasons, I don't know why this is even

3   an issue.

4          MR. MARDEROSIAN:  Let me just add these comments,

5   your Honor.  First of all, this trial date has been set now

6   for almost a year.  Mr. Goldman is the investigator that

7   worked directly with Mr. Krause, who reported directly to

8   Mr. Resnick, and wrote the report.

9          This trial date has been set.  I told them that I

10  want to call him in my case.  They indicated they would not

11  produce him.  They wanted to call him in their case.

12         I said, "Well, you can call him in your case, but I

13  want to call him in my case.  Pursuant to FRE 611, I want to

14  cross-examine him, I want to call him in my case, early on in

15  my case."

16         This pre-planned vacation, I don't know if that's

17  true.  That's the first that I have heard of that.  I was told

18  he was going to be out of the country supposedly for work

19  efforts.  He travels around for Mr. Resnick to different

20  countries to investigate some of the issues that some of the

21  other Wonderful holdings may have.

22         But this trial has been set for sometime now.

23  Mr. Goldman is key.  He was deposed.  And I served him with a

24  subpoena before he left.  You think he would call?  No.

25         Also, if they feel that the subpoena is improper,

1    where is the motion to quash?  There are no motion to quash.

2    They don't want me to call Mr. Goldman in my case.

3             And Mr. Goldman's conduct, the way he coerced and

4    threatened the employees, that's going to be an issue in this

5    case.  They want to avoid that.  And, your Honor, I have him

6    under subpoena.

7             THE COURT:  Okay.

8             MR. VASSEGHI:  Your Honor, we weren't even served

9    with the subpoena, so we didn't have an opportunity to bring

10   motion to quash.  Even if it is invalid, we don't have to

11   bring a motion to quash unless it is a valid subpoena, but

12   since we haven't been given it, we don't know where he was

13   served, we have none of that information.  And plus,

14   Mr. Goldman is going to be here during the trial.

15            MR. MARDEROSIAN:  We advised Mr. Vasseghi that he had

16   been served.

17            THE COURT:  That's not in front of me now.  I'm not

18   going to make a ruling on that.  I will go ahead and wait and

19   see.  And in the meantime, both sides are going to have to

20   spend a lot of time trying to figure out what you are going to

21   do.  Are you going to bring a motion to quash?  Are we going

22   to have to have a declaration indicating that this was a

23   wedding that was planned out, and he advised counsel, and they

24   worked it out to where he is going to definitely be here at

25   trial, but this is a surprise to him?  I have no idea.

1    So I suppose it is just a matter that you can spend

2  as much time on this as you folks can want.  This is one of

3  those things I said at the outset, if you can work together,

4  fine.  If you can't, then I will deal with it, and I will do

5  what's best for the parties and the witnesses.

6    MR. MARDEROSIAN:  Your Honor, not to belabor the

7  point, but I think one revealing point is counsel led me to

8  believe that he might be out of the country when we had our

9  meeting on August 1.  It turns out that he wasn't.

10    When, at that meeting, I said, "Well, I will show his

11  video."

12    "No, I'm not going to allow you.  I am going to

13  object to showing the video."

14    That, to me, reveals that this is an avoidance of

15  Mr. Goldman testifying in this trial.

16    THE COURT:  Uh-huh.  Well, if he is under subpoena

17  and it is a valid subpoena, he is going to be here.  When he

18  testifies, I will make that decision independently of both

19  sides based on whatever you present to me.

20    But assuming the subpoena is valid or defense assures

21  the Court and counsel that he is going to be here, then he

22  will be here.  If he is going to be here, whether he is taken

23  out of order in defense case-in-chief or whatever, or whether

24  I require the subpoena to be adhered to, will just depend on

25  the circumstances.

1        If he is going to be attending a wedding out of the

2   country, I will want information on that, when he got the

3   invitation, when he notified counsel of that, when he

4   anticipates leaving and when he anticipates coming back.

5        But as near as I can tell, he will be here, either

6   voluntarily or under subpoena, assuming the subpoena is valid.

7        But I can't rule on it right now because I don't have

8   that information to make a ruling on the validity of the

9   subpoena and also his reasons for not being able to be here at

10  the outset of the trial.  So file your motions, and we will

11  move on.  But thank you for bringing that to my attention, and

12  I will deal with it by way of motion.

13       Anything else preliminarily?  Okay.  We will get back

14  to the motions then.

15       Motion in limine number 5, exclude testimony or

16  evidence relating to investigations apparently relating to the

17  Burbank Police Department, some of its officers, et cetera,

18  the comments by Burbank City Councilmember.

19       Defense, on the motion?

20       MR. PECHT:  Yes, your Honor.  It, essentially,

21  relates to evidence which was brought up at deposition,

22  essentially, an investigation which Mr. Stehr, the former

23  Burbank Police Chief, did while he was the Burbank Police

24  Chief.  The behavior of police officers that he was actually

25  investigating is being ascribed to him in an effort to blemish

1  his character.

2        We don't think this has relevance.  We think it is

3  highly prejudicial and, on that basis, of relevance and

4  misleading, and waste of time, we would like to have it

5  precluded.

6        THE COURT:  Plaintiffs?

7        MR. MARDEROSIAN:  Just briefly, Mr. Stehr was brought

8  into the investigation by Mr. Goldman.  Mr. Stehr is not a

9  licensed investigator.  Mr. Stehr worked for Mr. Goldman,

10 supposedly.  Mr. Stehr was a former police officer for a short

11 period of time with the Burbank Police Department, but left

12 under controversy, or retired under controversy.

13       I'm okay with not referring to this if he doesn't

14 tout that he is the former police chief with the City of

15 Burbank.  I believe that the witness opens the door to that.

16       He is not a licensed investigator, and to somehow

17 support his credibility, to tell this jury that he is the

18 former police chief of the City of Burbank, I believe, opens

19 the door to cross-examination as to how long that was and what

20 were the circumstances that caused him to leave that position.

21       MR. PECHT:  Your Honor, first of all, he was a police

22 officer for 31 years with the Burbank Police Office, not one

23 year.  He was Burbank Police Chief for approximately a year or

24 a little bit more than that.

25       But regardless, the -- he is certainly entitled to

1    give his past work history relating to investigations,

2    including the fact he was the Burbank Police Chief.

3         However, this is a separate issue.  This is,

4    essentially, ascribing him bad acts by completely unrelated

5    individuals of which he was investigating.  It would be

6    similar to asking -- you know, ascribing acts of a judge in a

7    case that's before the judge.

8         It is simply unfair and prejudicial material that has

9    no bearing on this case.  It is he investigated police

10   brutality, and they are going to use that before the jury to

11   somehow associate him with police brutality that he was, in

12   fact, investigating himself.

13        THE COURT:  Okay.  In this case, as I understand it,

14   there is a proffer that Mr. Stehr -- I guess through newspaper

15   accounts, there was an internal Burbank Police Department

16   investigation, an FBI investigation regarding complaints

17   lodged during his tenure as police chief, a suicide of a

18   Burbank law enforcement officer, and then some unsuccessful

19   calls by a city councilmember of Burbank to place Stehr on

20   administrative leave.

21        This really goes far afield to qualifications.  And

22   to get into a mini trial as to what occurred in the Burbank

23   Police Department sometime ago, obviously, really opens the

24   door as far as 403 considerations.  It is a waste of time, and

25   also jury confusion as to the significance of Burbank and

1  Burbank Police Department to this particular case.

2          So at this point in time, I'm going to grant the

3  motion to exclude evidence of all of these Burbank Police

4  Department issues.

5          MR. MARDEROSIAN:  If I could --

6          THE COURT:  Having said that, depending on what

7  Mr. Stehr, assuming he testifies and relates his

8  qualifications, and I can't say now, because I don't know what

9  he is going to say, but perhaps what we could do, I suppose,

10  is to do a hearing out of the presence of the jury in which

11  Mr. Stehr testifies as to, on the record, as to what he would

12  state in terms of his qualifications.

13          And then if, at that point in time, plaintiff's side

14  can point to specifics as far as what plaintiff's side would

15  intend to attempt to elicit from him regarding, essentially,

16  challenging his qualifications.

17          And that's really the only basis I can see for that.

18  And so then we can proceed on, and then I will make rulings as

19  to, depending on what he testifies as to his background,

20  training, and experience, what, if anything, the plaintiff's

21  side can get into as far as anything that relates to his

22  tenure with the Burbank Police Department.

23          MR. MARDEROSIAN:  On that note, your Honor, Mr. Stehr

24  did contact my process server today, I believe.  I have him

25  under subpoena.

1        So I will remember, since I'm going to call him in my

2   case, that I will bring this to the attention of the Court

3   before the jury is brought in.

4        THE COURT:  Okay.  Now, if you meet and confer, and

5   you can figure out what the focus of what he can say as far as

6   his background, training and experience, that's fine.

7        If not, again, probably the cleanest thing to do

8   would be to have a hearing outside the presence of the jury

9   where he, essentially, will testify as to his background,

10  training, and experience, that he would testify to in front of

11  the jury.

12       Then I will allow plaintiff's side to indicate what,

13  if anything, in his prior history with the Burbank Police

14  Department might have some bearing on his qualifications,

15  credibility, et cetera.  Okay.  But it has to be specific.  So

16  you gotta give me, you know, page and line number of whatever

17  it is that you wish to use to challenge his qualifications.

18       Okay.  So on that one, again, I granted the motion.

19  I will exclude the evidence, but at the time he is noticed to

20  appear as a witness with that 24-hour notice, at the

21  appropriate time, let me know, and I will entertain a hearing

22  outside the presence of the jury.  And depending on what he

23  says in terms of his background, training, and experience, I

24  will allow a motion for reconsideration by the plaintiff's

25  side to attempt to elicit testimony regarding his experiences

1   with the Burbank Police Department.

2           Okay.   The next motion in limine is to exclude

3   evidence or comments referencing the fact that Wonderful

4   Citrus filed and/or dismissed its counterclaims.

5           Defense side?

6           MR. PECHT:  Your Honor, we submit on the papers.  And

7   I would additionally add that this would, again, create a mini

8   trial.  Plaintiff has stated over and over again that they

9   want to try as to whether the counterclaims were properly

10  filed in the first case, which is not at issue in this case.

11  So we would request the motion be granted.

12          THE COURT:  Plaintiff's side?

13          MR. MARDEROSIAN:  Your Honor, I understand, generally

14  speaking, that there is a litigation privilege to filing

15  pleadings, but there are exceptions.  And I believe that this

16  case lends itself perfectly to the exceptions that the law

17  permits.  And these are the reasons, as I see it.

18          First of all, the counterclaim goes to the

19  credibility and impeachment of Wonderful Citrus, the defendant

20  in this case, as to the validity of their investigation, the

21  so-called facts that led to the termination of Mr. Jordan.

22          The counterclaim is very specific, and goes through

23  the details of what he stole, how much he stole, all of these

24  alleged acts by Mr. Jordan that are set forth in that

25  counterclaim.

1          The dismissal is relevant as to evidence.  Whether or

2     not they will admit it or not, it is evidence that they did

3     not have any evidence or what Mr. Krause refers to as

4     "actionable proof."

5          What I mean by that is there is a specific e-mail

6     between Mr. Krause and Mr. Goldman, where not once, but twice,

7     he says, "If we don't have actionable proof, we are going to

8     get sued."

9          And Mr. Goldman comes up and he says, "Well, I will

10    be able to create a plan."  "I will be able to create a plan."

11         These are references from the President and the

12    investigator about how they were approaching this so-called

13    investigation.

14         This counterclaim, in detail, goes down and accuses

15    Mr. Jordan of all of these things.  And, ultimately, through

16    the discovery of this case, that counterclaim has been

17    dismissed because there is no evidence.

18         So credibility is the first basis that the plaintiffs

19    assert.

20         The second basis, your Honor, is the issue of malice.

21    Whether or not they had reasonable grounds for believing if

22    this common interest privilege ultimate issue goes to the

23    jury, whether or not those e-mails that outline; the first

24    e-mail was November 1, 2017, at 7:01 in the evening, issued by

25    Mr. Krause, to 3- to 400 employees that said James Jordan is

1    fired.  And that's the sum and substance of that.

2           41 minutes later, a second e-mail goes out, and

3    basically says:  This company won't tolerate theft.  We won't

4    tolerate anybody being a bully, and if anybody has any

5    information about this, please come forward.

6           The allegations in the counterclaim, even though the

7    second e-mail doesn't mention Mr. Jordan by name, the timing

8    is relevant, and the allegations in the counterclaim are

9    proof, absolute proof, because they are identical to the

10   allegations set forth in the e-mail issued by Mr. Krause.

11          So on the issue of reasonable grounds and malice, the

12   counterclaim that links it to the e-mail is very relevant on

13   the issue of whether or not there were reasonable grounds,

14   whether or not the defendant had reasonable grounds to believe

15   in the truth of the statements that were made.  We submit, it

16   is not even close.

17          But the counterclaim is relevant and the dismissal of

18   it is relevant as to the proof of malice that they had no

19   reasonable grounds for believing in the truth of what those

20   e-mails were stating and announcing to the world about

21   Mr. Jordan.

22          MR. PECHT:  Your Honor --

23          MR. MARDEROSIAN:  Your Honor, let me add this.  I

24   would request the Court to allow this evidence, and issue a

25   limiting instruction.  In fact, the defendants have already

1    proposed an instruction that talks about the dismissal of the

2    counterclaim.

3        This is one of those issues that I would ask the

4    Court to consider in allowing the plaintiffs to introduce this

5    evidence because it is relevance that these were false

6    statements that were made, false allegations.  They were

7    malicious allegations.  This goes to the heart of it, your

8    Honor, and this is a perfect situation for a limiting

9    instruction.

10       In reality, how this all came about, when I first

11   took on Mr. Jordan's case, I got a phone call from Chris

12   Cooper.  And he says, "If you sue, if Mr. Jordan sues, we are

13   going to send him to jail, and we are going to sue him for

14   damages.  "And that's what they did.

15       And now both of those issues have absolutely gone

16   nowhere.  The police report submitted by Mr. Vasseghi three

17   days after the lawsuit, or sometime after the lawsuit, and now

18   the counterclaim being dismissed, it was like a form of

19   intimidation to scare him from exercising his legal rights.

20       So there is a bad faith element to all of this as

21   well that I would ask the Court to take into consideration, a

22   powerful company trying to scare and intimidate an employee

23   from exercising his legal right of vindicating himself.

24       And I believe that a limiting instruction can cover

25   that issue.  I represent to the Court that I would not go

1  beyond what is reasonable in terms of introducing that

2  evidence.  It would be a subject matter of argument, but not

3  in regard to the presentation of evidence.  In fact, it may be

4  something that's subject to judicial notice, your Honor, and

5  it can be handled as simply as that.

6         THE COURT:  Okay.

7         MR. PECHT:  Your Honor, just briefly.  The jury

8  instruction that was referenced was only submitted if this

9  motion in limine is not granted.  So it was, -- if there is

10 evidence of this, we ask that that instruction be included.

11 So that was not correct.

12        Second of all, the legal motive or strategy of why

13 Wonderful Citrus has decided to dismiss its counterclaims is

14 not relevant to this litigation and would create a mini trial

15 that would involve the advice of counsel.  It would likely

16 create witnesses that are the counsel on the case.

17        And, secondly, the malice issue, which will come at

18 another motion in limine, is not relevant here.  Malice is

19 relevant is the malice that was with respect to Wonderful

20 Citrus' behavior at the time of the termination and the time

21 of the defamatory statements, not as to legal strategies that

22 are employed during litigation years later.

23        And so we would submit on our reply and moving

24 papers.

25        MR. MARDEROSIAN:  I think the important significance

1   here, your Honor, that adds a totally different dynamic is

2   this issue of using these tactics, filing a police report,

3   filing a cross-complaint, suing him for damages.

4          Don't forget about the emotional component when

5   Mr. Jordan learned he was now being sued for damages.  Not

6   only did they cause him financial harm, but the threat that he

7   may be subject to this lawsuit and the attorney's fees that

8   may be involved in that.

9          So there is an element of what I would call bad

10  faith, your Honor, that I think adds a different dynamic in

11  terms of making this relevant evidence that can be handled

12  efficiently and effectively, and then protected through a

13  limiting instruction.

14         THE COURT:  Okay.  And I understand what plaintiff's

15  side is saying.  And, certainly, perhaps in a different type

16  of a lawsuit, perhaps that would be something, some

17  retaliatory intimidation.

18         But what I would limit it to is the claims that are

19  presented.  And in this case, to the extent that it shows some

20  maliciousness, or whatever, in investigating, terminating

21  Mr. Jordan, it does appear character evidence, and would be

22  precluded under Rule 404(b)(1).

23         The evidence of the counterclaim -- second, the

24  evidence of the counterclaim has no relevance to Mr. Jordan's

25  age discrimination claims and good faith and fair dealing

1  claims.  They were premised on the facts occurring before and

2  during Mr. Jordan's termination, but not after.

3      With respect to the defamation relevancy argument,

4  Jordan's defamation claim is not based on Wonderful Citrus'

5  allegations made in the counterclaim itself.

6      And there is, yes, there is a California litigation

7  privilege, which is an immunity, not an evidentiary privilege,

8  so it does apply to California state law claims, such as

9  defamation, even those filed in the federal court.

10     With respect to damages, there has been no evidence

11 submitted with respect to damages as to whether and to what

12 extent Wonderful Citrus' counterclaim increases damages.  And

13 there is, of course, a litigation privilege regarding

14 defamation liability.

15     Again, I understand what plaintiff is saying as far

16 as the impact of -- arguably, the impact of filing a police

17 report and the counterclaim.  Of course, those individually

18 then engender, assuming you can get by the attorney-client

19 privilege, work product privilege, and the immunity, the

20 question of a mini trial justifying the filing of the police

21 report, and the arguments against that, and the filing of the

22 counterclaim, and the arguments against that.

23     And so we wind up litigating -- and certainly with

24 respect to the counterclaims, we wind up litigating the

25 validity of the counterclaims with a different standard as far

1    as what the jury needs to find.

2              And it is really confusing to the jury.  Are they

3    dealing with a counterclaim on the merits, it seems?  Then

4    that -- and that is just going to add to the confusion.  It is

5    going to add to the length of the trial.  Confuse the jury.

6              And I don't know of case authority that really

7    relates to evidence of a counterclaim that has been dismissed

8    that is required to be or should be admitted.  So in this

9    case, I am going to grant the motion to exclude evidence of

10   the counterclaim.

11             All right, the next motion is to exclude evidence

12   that Jordan's expert, Rhoma Young, donates money earned from

13   trial testimony to charity.

14             Defense?

15             MR. PECHT:  We submit on the papers.

16             THE COURT:  Plaintiff's side?

17             MS. COHEN:  We also submit on the papers.

18             THE COURT:  All right.  Obviously, it is general

19   practice, when you have an expert, the opposing side always

20   asks, "What are you being paid for this," and that obviously

21   goes to the potential of bias.

22             Candidly, I'm not sure how many juries or jurors

23   really buy the question of bias by the fact that an expert

24   testifies and gets paid for it, but I certainly understand why

25   all counsel have to ask that question.

1          So, certainly, the fact that some of the money earned

2   by an expert witness goes to some charitable entity,

3   organization, I guess the relevancy would be to mitigate the

4   bias.  "I'm not just doing it for myself, I'm doing it for

5   somebody else."  I can kind of sort of understand that.

6          But I don't know in this case, and it really gets far

7   afield.  Does she have an agreement with the American Cancer

8   Society that she will donate 10 percent of her earnings from

9   this case to them?  Or does she, at the end of the -- her

10  fiscal year, when she consults her tax consultant, does she

11  then make donations?  Does she always do that?  Does she do it

12  sometimes?

13          MR. MARDEROSIAN:  Your Honor, I think we can make

14  this simple.  I'm not going to elicit any testimony of her

15  donations to charitable organizations.  I will agree to that.

16          THE COURT:  I will grant the motion.  Darn, I was

17  halfway through.

18          MR. MARDEROSIAN:  I'm sorry, your Honor.  You were so

19  convincing, I capitulated.

20          THE COURT:  My sidenote was if experts found out

21  about this, I think every lawyer would say, "Donate something

22  to somebody.  We can bring that into evidence because Judge

23  Ishii allowed it."

24          MR. MARDEROSIAN:  We will stipulate.  We won't elicit

25  that testimony.

1              THE COURT:  Thank you.

2              Number eight, exclude evidence or argument relating

3      to Wonderful Citrus' report to the police.

4              Okay.  Defense?

5              MR. PECHT:  Your Honor, this relates to our argument

6      we just had relating to the counterclaims.  And specifically,

7      I would state again, there is no relevance as to the malice.

8      This is something that happened during the litigation.

9              And the malice that's required is the state of mind,

10     is the malice at the time the defamatory statements were made,

11     at the time that the plaintiff ws terminated.

12             And so this would be irrelevant.  And, regardless, it

13     would be prejudicial and subject, again, to the litigation

14     privilege that we discussed, and would create a mini trial as

15     to the police report.

16             THE COURT:  Plaintiff's side?

17             MR. MARDEROSIAN:  Your Honor, this is relevant

18     because I know specifically, in regard to the interview of

19     Mr. Jordan, which he was the last one to be interviewed by

20     Mr. Goldman and Mr. Stehr, by the way, on October 31, 2017,

21     the e-mail that I referenced earlier went out a few hours

22     later, on November 1, before Mr. Jordan even had a chance to

23     respond to any of this.  But this is relevant because there is

24     a significant issue in this case over employees being coerced

25     and threatened.

1       There aren't -- you will hear during the course of

2  the evidence, very few, if any, witnesses have any definitive

3  evidence on this issue of theft, but there is significant

4  issues over them being threatened with their job.

5       I know Mr. Jordan, during his interview, was

6  threatened with criminal investigations, going to the police.

7  "Mr. Resnick wants to go to the police, but Mr. Krause talked

8  him out of it," there was talk about that.

9       The fact that Mr. Vasseghi, the lawyer here, is the

10  one that submits it to the police after, long after Mr. Jordan

11  was fired, and shortly after Mr. Jordan filed this lawsuit to

12  vindicate himself, I think, is very, very relevant to show

13  that this is an atmosphere of coercion.

14       None of these interviews were ever recorded.

15  Supposedly, there is no recording of any interviews.  No

16  documentation as to the reasons for the termination.

17  Everything is ambiguous, everything is vague as to what went

18  down, but we know that a number of employees complained about

19  being threatened and coerced.

20       In fact, you will hear they went to the

21  Vice-President of Farming, Doug Carmen, who supervised

22  Mr. Jordan, wrote exemplary performance reviews about

23  Mr. Jordan's performance, he went to David Krause, Craig

24  Cooper, and Tom Goldman and said, basically:  What are you

25  doing here?  These employees are complaining they are being

1  threatened with their jobs.  They are in an environment of

2  being coerced and threatened, and they are afraid.

3          So that is a very important issue in this case.  And

4  this issue, obviously, is relevant in regard to a subsequent

5  action for malicious prosecution, I get that from the Court's

6  earlier comment.  But it is relevant into this case as well

7  because of the subject of threatening criminal conduct to

8  coerce and threaten employees.

9          THE COURT:  Well, I think kind of a two-edged sword

10  here.  What you are saying is the owner of the company says,

11  "No, no, no, don't file a police report," which makes him look

12  good, and then the lawyer goes and files a police report.

13          MR. MARDEROSIAN:  Well, what the report was is that

14  the owner wanted to file, go to the police, but the President,

15  Mr. Krause, supposedly talked Mr. Resnick out of it.  That's

16  what they told Mr. Jordan.  But there was talk about "This is

17  right on the edge.  The owner wants to go to the police."

18          THE COURT:  Okay.  Well, that's a different dynamic,

19  but it is the same outcome, is this wasn't something that they

20  waited to do.  It is something like, "My God, this guy is

21  stealing from us."  What do you do when -- you think someone

22  is stealing from you?  You go to the police.  And then he got

23  talked out of it.

24          So all I'm saying is there are a lot of ways that

25  this could be interpreted, and that's the problem, is that the

1   jury is trying to figure out:  What's the significance of

2   this?  Is it good?  Is it bad?  Should they file a report?

3   Yes, you know, if I were a victim of what I considered a

4   theft, I would go to the police right away.

5        And so, you know, under 403, you know, it is -- it

6   really lacks any kind of real probative value with respect to

7   what occurred or transpired in terms of the malice, et cetera,

8   at the time of the termination, of maliciousness.  And, of

9   course, if you have the fact that the attorney filed it, you

10  have the issue of the attorney-client privilege, work product,

11  and --

12       MR. MARDEROSIAN:  Well, let me raise this dynamic

13  here.  What if the jury gets into the jury room during their

14  deliberations, goes:  Geez, I wonder, was there ever a

15  criminal prosecution of Mr. Jordan?  Meaning the absence of

16  evidence.

17       Is the Court going to allow us to address the issue

18  of the absence of evidence?  No, he wasn't prosecuted.  No,

19  there wasn't even a police department that would even look at

20  this, is the point.

21       So if I can't reference the fact that they went to

22  the Delano Police Department and made a report but it went

23  nowhere, what do I do with the jury speculating as to whether

24  or not Mr. Jordan was prosecuted or not, or charged with

25  embezzlement, or that issue, meaning the absence of that

1  issue?

2        THE COURT:  Well, again, you raise an interesting

3  point which is then we get into the state of mind of the

4  Delano Police Department.  Why didn't they pursue this?  Did

5  they think there was insufficient evidence?  Did they send it

6  to the District Attorney, which is what they are supposed to

7  do?  And --

8        MR. MARDEROSIAN:  The answer is no to all of that.

9        THE COURT:  Yeah.  And the standard for police

10  agencies is beyond a reasonable doubt, probable cause, et

11  cetera.

12        So, you know, I can kind of sort of understand where

13  the plaintiff is coming from with respect to a police report

14  that's filed months after and, not so coincidentally, after

15  the lawsuit was filed, but it is still problematic with

16  respect to getting into what the police department did or

17  didn't do.

18        And, again, we need to focus on the fact that the

19  real state of mind in terms of maliciousness, the defamation,

20  et cetera, really came -- should have come right at the time

21  of the termination or the basis for the termination.  And

22  then, of course, if the attorney filed it, you do have the

23  work product, attorney-client privilege.

24        So I'm going to find that there may be some

25  relevance, but I think in both this motion, or this issue with

1     the police report, and the filing of the counterclaim, I do

2     see that there is some merit to what the plaintiff's side is

3     saying with respect to some evidence of maybe the course of

4     conduct of the defendant or the defendant's agents, but I just

5     think that it is not particularly relevant, and under 403,

6     would certainly be problematic.  So I am going to grant the

7     motion to exclude the evidence of the police report.

8           Nine is to preclude Jordan's family and friends from

9     providing duplicative testimony.

10           Defense side?

11           MR. PECHT:  We would submit on our papers, except

12     that I would note in a reply, there was a typo.  It should

13     have said that there is six duplicative witnesses, not four,

14     which would be Mrs. Jordan, Larissa Shipley, Jacob Naylor,

15     Justin Neece, Doug Rydberg, and Roy Price.

16           And all of these witnesses are presented to have

17     nearly identical character witness testimony, and it would

18     waste time and the resources of this Court to have six

19     duplicative witnesses on character.

20           MR. MARDEROSIAN:  First of all, that's not correct.

21     They are not identical.  They all play different relationships

22     with Mr. Jordan, have different information about how

23     Mr. Jordan has been treated, how it affected him.

24           And I don't know how a Court could even rule on a

25     motion like this.  As a trial lawyer -- and I have been in

1   this courtroom before -- I know the detrimental effect of

2   cumulative, redundant testimony, and I do my best to avoid

3   that.  And I will do that in this trial as well, and not

4   overstate any evidence, because it treads upon the job of the

5   jury and it undermines the jury, because I believe the jurors,

6   as a body, are intelligent in deciding what the true facts

7   are.

8          So all I'm saying to this Court, I don't know how you

9   can decide on a motion like this, just based on what Mr. Pecht

10  has to say.  I think you have to hear it before you decide

11  that it is duplicative or cumulative.

12         But I do represent to you that every one of these

13  witnesses have something different to say, a different

14  experience on how this has affected Mr. Jordan.  And I will

15  make the call to what degree that comes into evidence so that

16  I don't waste any time or lose the confidence of the jury by

17  redundant testimony.

18         THE COURT:  All right.  Let me -- I will take the

19  matter under submission.  And at any point in time, out of the

20  presence of the jury, after two or three family members or

21  friends testify, if you wish to then just go ahead and ask the

22  Court to make a ruling on this motion, I will do so.

23         If there is no request, then the motion would be

24  deemed denied as moot, but if there is an objection or concern

25  about cumulativeness or duplicativeness, certainly raise this,

1   and say, "I would like to have the Court address specifically

2   this motion in limine."

3           MR. PECHT:  Thank you, your Honor.

4           THE COURT:  Number 10 is to preclude speaking

5   objections.  It is agreed upon, and I will grant that motion.

6   Of course, it applies to both sides.  And so basically, just

7   object, you know, "Object," state the grounds.  I will rule on

8   it, and then move on.

9           If you believe that it -- the -- I have sustained or

10  overruled an objection on something absolutely critical, I can

11  do a sidebar, although I don't encourage them, or I can take a

12  recess, if I think it is going to be a little lengthy.

13          And, obviously, at a break, before a witness has been

14  excused, if you wish to address the Court, you know, "Judge,

15  you sustained an objection, and I want to explain further," I

16  will certainly entertain that.

17          So I will grant the motion and just rely on counsel

18  to make sure that you don't have speaking objections.

19          I do not allow or tolerate an objection where then

20  you start speaking, and then the other side starts speaking,

21  and you go back and forth, arguing with each other.  I'm not

22  saying you do that, but I have seen it happen in other cases,

23  and that's inappropriate, and I tell the jury, "That's

24  inappropriate."  So don't do that because it makes you look

25  bad in front of the jury.

1        Now, one thing I do want to remind you, and maybe

2   some of this is rote, if there is an answer, and you object to

3   the answer, and the answer has been given, and I sustain the

4   objection, you have to affirmative move to strike the answer

5   because I don't do it automatically.  Sometimes it is really

6   obvious.  I'll sustain an objection, and admonish the jury to

7   disregard the last answer, or whatever.  Usually, I will do

8   that, but if I fail to do so, make sure you move to strike.

9        A lot of times, I will tell the jury, "Objection

10  sustained.  Disregard that last answer," or whatever, and I

11  will do it on my own, but if I forget to do that, remind me to

12  formally order that the response be stricken.

13       Okay.  The next one is number 11, preclude evidence

14  of Wonderful Citrus', including its owner's, wealth and

15  resources during the first phase of the trial, including open

16  opening statements.

17       Defense?

18       MR. PECHT:  Yes, your Honor.  We submit on our

19  motion, except I would like to make the point that Wonderful

20  Citrus is one of several affiliate companies under the

21  umbrella of The Wonderful Companies.  And there is concern

22  that plaintiffs would present evidence of these other

23  unrelated companies, such as Fiji Water, or Teleflora, or

24  those sort of companies, to present to the jury, in a sense,

25  that Wonderful Citrus is a massive company, and would

1  prejudice them in that stage of the trial rather than later,

2  if there was a punitive damages stage.

3         And I wanted to emphasize that and, otherwise, submit

4  on our motion.

5         THE COURT:  All right.  Plaintiff's side?

6         MR. MARDEROSIAN:  Your Honor, again, this is one of

7  those areas where I understand the limitations as a trial

8  lawyer on an issue like this.

9         But at the same time, and I think the Court

10  understands this too, the jury has to have an understanding of

11  the background of who the employer is, just like they receive

12  a background on where Mr. Jordan came from, who he is, what

13  type of person he is.

14         In this situation, just of so that you know the

15  organization, Stewart Resnick owns The Wonderful Company, he

16  and his wife, Linda Resnick.  The Wonderful Company owns

17  Wonderful Citrus Packing LLC, the employer of Mr. Jordan.

18         The Wonderful Company, you probably know this in

19  terms of their product, there is the Halo brand mandarins in

20  the citrus family, of which Mr. Jordan was directly involved

21  in.  There is Pom Pomegranate Juice.  There is Teleflora.

22  There is Justin Wines.  There is Fiji Water, as Mr. Pecht

23  mentioned.  So this company, I think I have seen in some of

24  the literature that over half of the Americans in this country

25  buy one or more of their products.

1     Now, there is limits to that.  How does it become

2  relevant as to the size and sophistication of a company that's

3  controlled by Mr. Resnick?

4     There will be testimony in this case, Mr. Krause

5  admitted it, that Mr. Resnick made the decision himself to

6  fire Mr. Jordan based on what Mr. Krause and Mr. Goldman were

7  providing Mr. Resnick.

8     There could be testimony as well -- and I don't want

9  to make a representation to the Court, so I won't make this

10 representation.  But all of that, if presented in a limited,

11 respectful manner, will give the jury some understanding of

12 the size, sophistication of this company, how they go about

13 dealing with their employees, their handbook, all of these

14 things.

15    What is interesting about this case is they avoided

16 the HR Department.  Wonderful Citrus Packing LLC has its own

17 HR department.  One of the witnesses is Alice Delgado, which

18 was a director.  There is Danny Garcia, who was, I think, the

19 Head HR.  They were left out of the investigation because of

20 whatever the reasons were.

21    So we have a company the size that they are, and how

22 they went about this so-called investigation, which I believe

23 was pre-determined to target Mr. Jordan, and get rid of

24 Mr. Jordan, and the things that they did that violate their

25 own practices.  A sophisticated company should not conduct

1   itself that way.

2          I would like to make that argument.  That's one

3   basis.  The other basis is that Mr. Jordan's responsibilities,

4   he oversaw 7,000 acres.  There is about 35,000 acres of citrus

5   here in California.  When you add in Texas and Mexico, the

6   citrus farming alone has close to 50,000 acres of citrus that

7   is being produced here.

8          Mr. Jordan was responsible for the development of the

9   nursery, for their trees.  He was responsible for overseeing

10  the production in the Northern Division, which was about 7,000

11  acres.

12         There is a lot of stress involved.  The witnesses

13  have talked about the stress that he was under.  He had a

14  heart attack that almost took his life.  Never made a worker's

15  comp claim.  Went back to work when he got out of the

16  hospital.

17         So the point is if they are going to claim that he is

18  some bully that says vile things to other employees, and this

19  was the reason for him to be fired, I think it is important

20  for the jury to understand the facts and circumstances of what

21  the job entailed and the stresses that were involved, which

22  means:  How many acres are we talking about here?  Who is he

23  reporting to?  How important of a position is this to the

24  overall company?  How involved is Mr. Resnick himself?

25  Mr. Resnick micromanages this company and was very involved.

1        So all of these things, your Honor, if it is

2    presented in a manner that's not offensive to the Court or to

3    the jury -- I think I know how to do that -- as opposed to

4    making some blanket ruling that would limit me from

5    introducing evidence so the jury understands who the employer

6    is, who Mr. Krause reports to, why he was reporting there,

7    what stresses was the citrus component of this company under,

8    I think it is important for them to know that, without

9    overdoing it, overbaking that, your Honor.  I think I know how

10   to do that, but to issue some blanket order that under the

11   guise of the so-called wealth of Wonderful.  They are a big

12   company.  They are a big company.

13       And to comment on that in a relevant way is what my

14   goal would be.  And if I got out of line on that and there are

15   objections, this Court would know what to do with that.

16       But the jury has to appreciate who they are.  Why was

17   HR abandoned?  These are issues be that I think need to be

18   explained.

19       MR. PECHT:  Your Honor, if I may, a couple points.

20   Much of what plaintiff's counsel has said has nothing to do

21   with this motion or net worth.  We obviously -- Mr. Resnick is

22   a factual element in this case.  We are not going to prevent

23   testimony that he owns the company, but we think it would be

24   inappropriate to discuss his wealth, which is part of our

25   motion.

1       The Wonderful Company has affiliates.  We don't think

2   that they are relevant here.  He mentioned like Justin Winery,

3   I just don't think that's something that should be a

4   reference.  In particular, the wealth of or net worth of any

5   of those companies would certainly not be relevant.  The total

6   acreage of Wonderful Citrus business is not relevant.  That

7   would be the equivalent of the net worth of the company, which

8   would not be appropriate to be disclosed at this time and

9   stage.

10       To the extent Mr. Jordan had responsibilities with

11   Wonderful Citrus, that's obviously fair game.  What his

12   responsibility was within that company.  The company is a

13   corporate structure.  The company's, you know, structure, who

14   is owned by, those are fair game, but not the net worth of the

15   company, and the net worth of its owner and net worth of

16   affiliated companies.

17       The acreage he obviously managed is perfectly fine to

18   reveal, but we are asking by this to preclude evidence of

19   Wonderful Citrus and its owner's wealth.

20       MR. MARDEROSIAN:  I'm not talking about the net

21   worth.  I'm smart enough to know that that comes if the jury

22   marks the box on the initial verdict form "malice, oppression

23   or fraud."  That's not where I'm coming from.

24       I'm coming from the fact that Mr. Resnick, the owner

25   of The Wonderful Company, who also owns Wonderful Citrus, who

1  Mr. Krause reports directly to, he made the call to fire

2  Mr. Jordan.

3        I don't suspect that Mr. Resnick is going to be here

4  during the course of this trial.  They have refused to produce

5  him.  And I don't suspect that he is going to be here.

6        But the sophistication, the company approach to how

7  they conduct their business in terms of their employees based

8  on the size of the company, and what they are involved in, and

9  what Mr. Jordan's role was at.  Mr. Jordan not only worked in

10  California in setting up the nursery, but he also went to

11  Texas as well.

12        Mr. Goldman, who worked for Mr. Resnick, he oversaw

13  the properties in Mexico as well, and he testified to all of

14  those things.  It is going to come out just in the normal

15  course of eliciting testimony in this case.

16        I'm not talking about dollars.  I wouldn't represent

17  to this Court, even though the Internet says that Mr. Resnick

18  is worth nine billion dollars, I wouldn't represent that or

19  try to present that kind of evidence.

20        I'm talking about the corporate governance,

21  structure, operation, why HR was left out.  How expansive of a

22  company is this in terms of how they handle their employees.

23  That's what it is all about.

24        THE COURT:  All right.  Well, to the extent that the

25  motion is to preclude evidence of Wonderful Citrus', including

1   its owner's, wealth and resources during the first phase of

2   the trial, including opening statements, is granted.

3   　　　　And the reason for that is it's really not relevant.

4   And the wealth, the resources, et cetera, et cetera, are

5   really not relevant at all, other than prejudicial, perhaps.

6   　　　　But I understand, though, and I want to make sure

7   that everyone understands, some of this information is going

8   to come out, but it has to come out within the context of the

9   trial itself.

10   　　　　So to the extent that, for example, termination

11   e-mails were sent to X number of employees is going to come

12   out, not that it has anything to do with the overall size of

13   the corporation, but certainly, to the extent that the

14   termination e-mails were sent, to the extent that's relevant,

15   and to the number of people or the individuals, that's

16   relevant.

17   　　　　The work that Mr. Jordan did for the company, whether

18   it was here in California or out of state, is relevant because

19   he is going to have to testify as to what he did and the

20   acreage that he was responsible for, the locations.

21   　　　　And that all relates, really, to the facts of the

22   case, not the general wealth and resources of the overall

23   company.

24   　　　　Unless Mr. Jordan worked in the wine industry or the

25   bottled water industry, I don't see why that should have to

1   come out.

2          If there is a construction component, land holdings,

3   for offices, commercial, residential.  If Mr. Jordan had

4   nothing to do with that, then that's irrelevant.

5          So I have granted the motion, but understanding that

6   certain things would have to come out with respect to how it

7   related to Mr. Jordan and his work with the company, and what

8   the company did with respect to the investigation and

9   termination of Mr. Jordan.

10          Now, in terms of voir dire, I could leave it to

11   counsel.  You can certainly submit proposed voir dire

12   questions as far as what entities under the Wonderful Citrus

13   or the parent company, that the jury should be aware of, to

14   know whether or not they have had any dealings with those

15   companies.  You can submit those.

16          But, again, it is not all the assets, it is not all

17   the properties, it is not all the investments.  It is just

18   those that relate to Mr. Jordan's work with the company, and

19   to see whether or not people are familiar with various brands

20   that Mr. Jordan was involved in as far as citrus or other

21   product or produce that he was involved in.

22          And, certainly, the jury can be -- jury panel, on

23   voir dire, can be asked if they are familiar with any of those

24   brands.

25          MR. MARDEROSIAN:  Understood, your Honor.

1          THE COURT:  Okay.  Number 12, exclude any mention of

2    Wonderful Citrus' counsel is in-house or a captive law firm.

3          Defense?

4          MR. PECHT:  We will stand on our motions.

5          THE COURT:  Plaintiff's side?

6          MS. COHEN:  We will submit, your Honor.

7          THE COURT:  All right.  Well, to the extent that the

8    Roll Law Group is in-house counsel for Wonderful Citrus is

9    relevant.  That would probably come up in terms of the

10   testimony as far as who was consulted, et cetera.  And to that

11   limited extent, certainly, the fact that the Roll Law Group is

12   in-house counsel would come up just in the course of the

13   testimony of the various witnesses as far as consulting and

14   what was done, et cetera.

15         So I would allow that, but other than that, it would

16   seem to be irrelevant, other than the fact that they had to be

17   in-house counsel and been involved in the case.

18         Number 13, exclude any Golden Rule arguments.  It is

19   agreed.  That motion is granted.

20         14, exclude any reference to the parties' motions in

21   limine.  That is granted also.

22         Now, oftentimes during the course of trial -- and I'm

23   sure you have done it yourself -- is you will state an

24   objection and, simply for a limited purpose, might say,

25   "Objection, your Honor.  Motion in limine," or "prior ruling,"

1   or whatever.  Sometimes that occurs.

2           The problem sometimes is that I may miss the specific

3   motion in limine you are referring to or the prior ruling.  So

4   the best thing to do is state a ground, but if the ground is

5   contained within a motion in limine, then you can say,

6   "Objection.  Motion in limine."  Generally, I will be able to

7   pick up from that statement what portion you are talking

8   about.

9           So I will grant the motion to exclude reference to

10  either party's motion in limine, recognizing, of course, that

11  that comment, motion, might come up in terms of the basis for

12  objection or on overruling objection.

13          15, exclude nonparty witnesses from being in the

14  courtroom.  And again, I have already ruled as a general

15  ruling with respect to excluding prospective witnesses and

16  requiring counsel to make sure no prospective witnesses are

17  present while another witness is testifying.

18          Those are the defense motions in limine.  Anything

19  further with respect to the defense motions in limine?

20          MR. PECHT:  No, your Honor.

21          THE COURT:  Plaintiff, as to defense motions in

22  limine?

23          MR. MARDEROSIAN:  No, your Honor.

24          THE COURT:  All right.  Those will be the rulings of

25  the Court then.

1          Okay.  I may have missed something.  Anything else

2     with respect to any pending motions or the motions in limine?

3          Plaintiff's side, anything else with respect to

4     motions?

5          MR. MARDEROSIAN:  I don't believe so.  Thank you,

6     your Honor.

7          THE COURT:  Defense, anything with respect to

8     motions?

9          MR. VASSEGHI:  No, your Honor.

10         THE COURT:  All right.  Couple things.  In terms of

11    housekeeping, on jury instructions, you still have some time,

12    but I would appreciate it if you would meet and confer on jury

13    instructions and verdict forms.  I don't necessarily expect

14    you to agree on all of them, but as I mentioned in our

15    pretrial conference, it really helps out if you can agree on

16    at least the model instructions, whether they are the state

17    instructions or the federal instructions.

18         Certainly, with respect to the preliminary jury

19    instructions, I mean most of those are boilerplate as far as

20    the Federal Model Jury Instructions in terms of preliminary

21    instructions, so those should be fairly straightforward.

22         And the reason I want those pretty much completed, as

23    soon as we start the trial, you know, I'm going to read the

24    preliminary jury instructions to the jury, and I don't want to

25    spend a lot of time after we pick the jury wrestling with

1  trying to put together, finalize the preliminary jury
2  instructions.

3       To the extent you can agree on model instructions,
4  state and federal, with respect to the substantive motions or
5  the concluding instructions or mid trial instructions, if you
6  can agree on those, that would be helpful.

7       As far as the concluding instructions, in this case,
8  I understand we will be working on jury instructions starting
9  now.  I shouldn't say "now."  Starting from the time you
10 submit your proposed jury instructions.  And we will be
11 working through instructions, and to the extent that you can
12 agree on them, they will be in finalized form.  And those that
13 you don't agree on, obviously, will have instruction
14 conferences during the course of the trial.

15      Again, the goal is that our final instruction
16 conference, which you are entitled to, hopefully, we have it
17 narrowed down to a handful of instructions so we don't spend
18 an undue amount of time while the jury waits for us.

19      So I would like to get as many of those in final
20 form.  And the advantage of that to you is once we get the
21 instructions done, we can hand you the instructions,
22 concluding instructions, because I give those before you give
23 your closing argument.  Same with the verdict form.

24      In terms of trial exhibits, if you can meet and agree
25 on joint exhibits, that would, obviously, help in terms of

1   your preparing for trial and recognizing the exhibits that you

2   don't have to worry about in terms of objections, and that I

3   don't have to be concerned about in terms of interrupting the

4   trial throughout just to deal with objections to trial

5   exhibits.

6         The other thing is -- and again, this isn't set.  I

7   just want to get an idea, and I will ask you on the morning of

8   trial, the time estimate for the trial, the rough time

9   estimate.  I have set aside three weeks, four days a week.

10  That's 12 days.  If you think we need more than that timeframe

11  wise, then let me know.

12        MR. MARDEROSIAN:  With that said, your Honor,

13  currently, on the list that I have developed in terms of the

14  witnesses that I intend to call, I am at 26 witnesses.  Now, I

15  imagine that I can pare that down a bit, but I would

16  imagine -- if we are going Tuesdays through Fridays?

17        THE COURT:  Yes.

18        MR. MARDEROSIAN:  I could envision me, I try to move

19  it along, but there is a possibility I could consume all three

20  of those weeks just in regards to my case.

21        Now, I anticipate calling most of the defendant

22  witnesses here in my case, but I just want to advise the Court

23  of that.  And again, it depends, as you know, how cooperative

24  witnesses are.  How many objections to argue during the course

25  of trial.  All of those things come into play, but I think

1   this is a case that needs, we need to get it all out there,

2   and so I want to bring that to the attention of the Court.

3   THE COURT:  Okay.  Defense, just a rough estimate?

4   MR. VASSEGHI:  Your Honor, I think at this point,

5   three weeks is our best estimate.

6   THE COURT:  Again, the morning of trial, let me know

7   what your best estimate is.  Remember that's the time that I'm

8   going to tell the jury panel their commitment is.  So if it is

9   three weeks, four weeks, five weeks, whatever, obviously, I

10  want to be as candid and as helpful to the jury panel as

11  possible as to their time commitments.

12  And so do your best in the next couple of weeks to

13  try to figure, okay, roughly we are talking three weeks, we

14  are talking five weeks, whatever, so that I can tell the jury

15  panel this is their time commitment for this particular case.

16  MR. MARDEROSIAN:  I can tell the Court that I think

17  my best estimate is I will try to present the case so that the

18  entire case can be tried within that three-week period of

19  time, but there is a possibility that it may extend into a

20  fourth week.  So if we are talking four-day weeks, then if I

21  consume all 12 days of trial time, it may require another four

22  days to complete the defense case, your Honor.

23  THE COURT:  All right.  Just let me know, again, on

24  the morning of trial, how much time.  I'm blocking out the

25  last two weeks in September.  We start the 17th, the week of

1     the 17th, the 24th, and I will probably set aside three weeks

2     in October:  Tuesday, October 1st, Tuesday, October 8th, and

3     Tuesday, October 15th.  Now, the 14th is Columbus Day, so we

4     won't be in session on Monday, October 14.

5            Again, keep that in mind in terms of also getting

6     your witnesses lined up, but I will blocked off five weeks

7     just in case.

8            With that, then, any other issues that we need to

9     take up today or at least be aware of plaintiff's side?

10           MR. MARDEROSIAN:  No, your Honor.

11           THE COURT:  Defense side?

12           MR. VASSEGHI:  Your Honor, just a few issues.  With

13     respect to jury instructions, I want to make sure that we are

14     addressing the Court's needs.  So the Court would want two

15     lists of jury instructions, one which both sides agree to, and

16     one list which neither party agree to.

17           The list that neither party agree to, do they need to

18     be put in a certain sequence?  In other words, if there is one

19     jury instruction that we both want, but we want some

20     modification, do we put those together?

21           We are trying to streamline it so it is easy for the

22     Court.  If you can give us some direction on that, that would

23     be helpful.

24           THE COURT:  The instructions you agree on,

25     preliminary instructions, mid trial instructions, concluding

1    instructions.  If you agree on those aspects, you know, those

2    can be pretty much, you know, the procedural jury instruction

3    would be the Ninth Circuit Model Instructions.  Those are

4    pretty straightforward, especially the preliminary jury

5    instructions.

6             The one that requires a little bit of effort is the

7    second instruction, which talks about the brief summary of the

8    case, and sometimes you might have a disagreement on that.

9    But, again, remember, it is not evidence in the case, it is

10   simply to advise the jury of the nature of the case.

11            But so I would hope that the preliminary jury

12   instructions are relatively straightforward, and if you have

13   some disagreements, that's fine.

14            The mid trial instructions that you agree on, again,

15   you -- there may be some that you say.  "These might be given,

16   but we are not sure."  You know, charts and summaries, and

17   some other things that, you know, you are not really sure,

18   depending on, you know, judicial notice, et cetera.

19   Stipulations of fact, those sorts of things.  You might put

20   them in, just in case.

21            And then the concluding instructions, you know, the

22   Model Instructions with respect to the Ninth Circuit and also

23   the California state instructions that are applicable so that

24   I will know which instructions you agree on.

25            And then what you can do, if you want, is you can

1   submit, plaintiffs can submit those instructions that

2   plaintiff's side wants to give.  Defense can submit those

3   instructions defense wants to give which are not part of the

4   agreed upon instructions.  Okay, these are the plaintiff's

5   instructions they want.  These are defense instructions.

6        And then we will cross-reference them, and if there

7   are identical instructions, but the wording is a little bit

8   different on them, then I will certainly be aware of that.

9   And during the course of the trial, if we break early one day

10  or whatever, and we have some time, I will start going through

11  the instructions with you.  And where there are some

12  disagreements on the specific language, I will hear you out.

13       And then, to the extent that I can, I will rule on

14  those as far as what I'm going to give, propose to give.  And

15  then we can construct those.

16       And then, again, my goal would be on our final

17  instruction conference, that we are hopefully down to a

18  handful of instructions that we just have not had a chance to

19  adequately deal with.  And some may require the full array of

20  evidence before I can actually rule on a proposed instruction

21  for which there is a disagreement.

22       Yes?

23       MR. VASSEGHI:  Thank you, your Honor.

24       THE COURT:  Same thing with the verdict form.  If you

25  can agree on a verdict form, that's fine.  If you disagree,

1    submit your own separate verdict forms, and I'm going to work

2    on those.  And we will, if you can't agree on it, ultimately,

3    I'm going to come up with a verdict form, so, you know, do the

4    best you can.

5         I mean as you know, whoever loses is going to file a

6    motion for a new trial or whatever, an appeal, and usually an

7    issue are jury instructions, so one is going to get struck

8    defending my instructions, so you might get together and work

9    those out.

10        Defense?

11        MR. VASSEGHI:  Are there any time limits with respect

12   to opening statements, closing arguments?

13        THE COURT:  No.  I don't impose time limits on

14   opening statements, closing arguments.

15        With respect to visual aids in opening statement, I

16   do require that you disclose any visual demonstrative,

17   whatever information that you are going to present to the jury

18   to the other side first.

19        If you don't do that, and you try to display

20   something, a timeline or whatever, jury instructions that have

21   not been agreed to, and the other side objects, I'm going to

22   stop you right in the middle of your opening statement.  I

23   will send the jury out.  I will go ahead and deal with them,

24   and that will interrupt your opening statement.  So make sure

25   you let the other side know what visual aids you might use in

1    your opening statement.  Same is true with closing arguments.

2          So bottom line is, no, I don't have time limits.  I

3    always tell lawyers, which you are well aware of, which is

4    that you have 15 minutes basically, although now I have heard

5    seven minutes, that's the attention span of the average

6    person, and that includes your jury.

7          But, obviously, you could spend hours because this is

8    a very lengthy case, you might spend hours, and that's

9    perfectly fine.  I can understand that.  But I don't put time

10   limits on it.  You have to use your discretion on that as far

11   as being able to keep the attention of the jury.

12         MR. VASSEGHI:  And as far as giving the presentation

13   of the opening statement, closing arguments, is the well

14   allowed, lectern?  Where is our boundaries?

15         THE COURT:  I allow you to step away from the podium

16   at any time.  There is a row of chairs in the front there in

17   front of the jury box.  If you can reach out and touch that,

18   you are too close.  Other than that, the well is yours.  You

19   can move around.  The podium is very bulky, but if you want to

20   move it to face the jury on opening statement, closing

21   argument, you can do that.

22         With respect to any technical stuff, PowerPoint or

23   whatever, again, if you have not done it already, make sure

24   you check with Ms. Gonzalez as far as coordinating with our IT

25   people so that before the trial starts, you can have people

1   come in to make sure your stuff is compatible with our stuff.

2          MR. VASSEGHI:  Very good.  I understand that we are

3   allowed to set up a day prior to the start of trial?

4          THE COURT:  Yes.  Yes, you are.  And also, if you

5   have a bunch of bulky stuff that you don't want to take home

6   overnight or over the weekend, we can store it here.  We can

7   lock up the courtroom.  If I do have a session while you are

8   out, which is on Mondays, if at all, I will let you know so if

9   you need to take your stuff out over the weekend or overnight,

10  you can do that.  If you want to leave them in the courtroom

11  to store them here, you can do that.  Again, we lock the

12  doors.  And if I have a session while you are not here, they

13  are not allowed to go approach your materials because we put

14  them back behind Mr. Stewart.  They are not supposed to get

15  back there.

16         MR. VASSEGHI:  Your Honor, with regards to -- I don't

17  know if this is going to even come up, but with regards to

18  impeachment testimony via deposition, if, in fact, during the

19  deposition there was an objection made in the sequence of the

20  transcript that we are going to be looking at; is that

21  something you will rule on on the spot, or how does that work?

22  What's your preference?

23         THE COURT:  If you see a portion in the deposition

24  where you objected for the record, and then the answer was

25  given, with the objection in place, if you are going to read

1    from the deposition transcript, and you want to flag that to

2    the Court, "Your Honor, there was an objection here and these

3    were the answers, but we want to object now before I read this

4    to the jury," then I will certainly do that.  And that's

5    perfectly fine.

6           Other than that, basically, if you are going to read

7    from a deposition for any reason, make sure you recite the

8    pages and line numbers so the other side can pull out their

9    deposition transcript and be ready.  So just wait until they

10   are ready to go.

11          Obviously, there are rules with respect to the use of

12   deposition transcripts, so make sure that you follow those,

13   and as far as what you can and cannot utilize deposition

14   transcripts for.

15          MR. VASSEGHI:  I want to get a better understanding

16   of the jury selection process.  I understand that we are going

17   to be providing you with voir dire questions.  Are those the

18   questions that you are going to be using to pre-screen and

19   impanel the 14 jury members?

20          THE COURT:  Yeah.  What happens is you can -- you are

21   not required to, but you can certainly submit proposed

22   questions that I would be asking the jury panel.

23          Basically, what's going to happen is the jury panel

24   will come in.  We will seat 14 in the box.  I will go ahead

25   and ask my set of questions.  I will incorporate your set of

1   questions, if you submit any.  And so that will be presented
2   to the 14 in the box.

3          As I mentioned in our pretrial conference, if, for
4   whatever reason, I excuse one of the prospective jurors in the
5   box for cause, they will be excused and we will fill that
6   seat.

7          So that if seat number 1, the prospective juror in
8   seat number 1 is excused, I don't move everybody forward and
9   fill 14.  I fill seat number 1.  And then so I will go through
10  my questions, use your questions.  Once I'm done, I will allow
11  you to write down questions you want me to ask.  And then
12  after that, I will allow counsel to do individualized voir
13  dire.  So, yeah, the questions you submit are ones that I
14  incorporate in my inquiry.

15         MR. VASSEGHI:  Okay.  Final question, and this may be
16  more for Ms. Gonzalez, I don't know.  The use of the
17  conference rooms outside, are we allowed to bring a printer
18  and set up during the trial, or is that only for people who
19  have hearings?

20         THE CLERK:  You are allowed to do that, if you set up
21  out there, you can do that.

22         MR. VASSEGHI:  Those will be locked, and we can have
23  exclusive access to them?

24         THE CLERK:  Yes.

25         MR. MARDEROSIAN:  We are planning to use the one to

1  the left, and defense can use the one to the right.

2          THE CLERK:  That's how it usually works.

3          THE COURT:  We will coordinate with our security

4  people so they are aware of that, and so that you make sure

5  you have exclusive access to the respective attorney

6  conference rooms.

7          MR. VASSEGHI:  That's all my questions.  Thank you,

8  your Honor.

9          THE COURT:  Thank you.  Now, if anything should come

10  up between now and the trial date that you want me to be

11  involved in, check with Ms. Gonzalez.  We will set up a

12  telephonic conference call.  If you need to have it reported,

13  let me know so we can have a court reporter available.  And

14  certainly feel free, obviously, because we are literally on

15  the brink of trial, that if you have anything of any

16  significance at all that you feel that I need to be involved

17  with, let me know, and I should be pretty available most of

18  this and next week so we can do telephonic conferences, if

19  necessary.

20          MR. MARDEROSIAN:  Thank you, your Honor.  On the

21  17th, we appear here at 9:00 or 8:30?

22          THE COURT:  8:30.  You will come in the courtroom at

23  8:30 every morning.  We have the jury come in at 9:00.  The

24  reason we do 8:30 is if there are any issues that carry over,

25  legal issues, we can get those, hopefully, resolved or

115

1    addressed between 8:30 and 9:00 o'clock, and then we will take

2    a quick break, and we will have the jury come in, and continue

3    on with presentation of evidence.

4              MR. MARDEROSIAN:  Thank you, your Honor.

5              THE COURT:  We will see you on the 17th.

6         (The proceedings were concluded at 4:40 p.m.)

7              I, PEGGY J. CRAWFORD, Official Reporter, do hereby

8           certify the foregoing transcript as true and correct.

9

10   Dated:  8th of September, 2019     /s/ Peggy J. Crawford
                                        PEGGY J. CRAWFORD, RDR-CRR
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25