1    **UNITED STATES DISTRICT COURT**

2    **EASTERN DISTRICT OF CALIFORNIA**

3

4    **JAMES K. JORDAN,**                              **CASE NO. 1:18-CV-00401-AWI-SAB**

5           **Plaintiff,**

6    **v.**                                            **ORDER DENYING DEFENDANT'S**
                                                       **RENEWED MOTION FOR JUDGMENT**
7    **WONDERFUL CITRUS PACKING LLC,**                 **AS A MATTER OF LAW AND**
     **a California limited liability company,**       **MOTION FOR NEW TRIAL**
8
                                                       (Doc. No. 189)
            **Defendant.**
9

10                              **I.  Introduction**

11         In this lawsuit, a terminated employee, Plaintiff James Jordan ("Plaintiff"), alleged that his

12   former employer, Defendant Wonderful Citrus Packing LLC ("Defendant"), defamed Plaintiff by

13   publicly stating that Plaintiff committed a crime.  After a sixteen-day jury trial, the jury returned a

14   unanimous verdict in Plaintiff's favor.  The jury found that the statements made by Defendant

15   were false and were understood to mean that Plaintiff committed a crime.  The jury also found that

16   Defendant's statements did not fall within California's common-interest privilege, meaning

17   Defendant either made the statements with hatred or ill will towards Plaintiff or without

18   reasonable grounds.

19         As for damages, the jury found that the defamatory statements caused damage to Plaintiff

20   in the amount of $482,114 for actual harm to property, business, trade, and occupation, and

21   $1,958,957 for actual harm to reputation, for a total of $2,441,071.  The jury also found that the

22   defamatory statements caused damage to Plaintiff in the amount of $2,500,000 for assumed harm

23   to reputation, shame, mortification, or hurt feelings.  Therefore, in sum, the jury awarded Plaintiff

24   $4,941,071 due to Defendant's defamation.

25         After the trial concluded, Defendant filed both a renewed motion for judgment as a matter

26   of law pursuant to Rule 50(b) of the Federal Rules of Civil Procedure and a motion for new trial

27   pursuant to Rule 59.  See Doc. No. 189-1.  Those motions are now before the Court.  For the

28   reasons discussed below, the Court will deny the motions.

## II.  Legal Standards

**1.     Rule 50(b).**

A district court may set aside a jury verdict and grant judgment as a matter of law only if, under the governing law, there can be but one reasonable conclusion as to the verdict.  Settlegoode v. Portland Pub. Schs, 371 F.3d 503, 510 (9th Cir. 2004); Winarto v. Toshiba Am. Elecs. Components, Inc., 274 F.3d 1276, 1283 (9th Cir. 2001); Fed. R. Civ. Pro. 50.  When considering a motion to set aside a jury verdict, the court should review all of the evidence in the record in the light most favorable to the non-moving party and must draw all reasonable inferences in favor of the nonmoving party.  Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 150-51 (2000); see also Settlegoode, 371 F.3d at 510; City Solutions v. Clear Channel Communs., Inc., 365 F.3d 835, 839 (9th Cir. 2004); Horphag Research, Ltd, v. Pellegrini, 337 F.3d 1036, 1040 (9th Cir. 2003).  The court may not make credibility determinations or weigh the evidence and must disregard all evidence favorable to the moving party that the jury is not required to believe. Reeves, 530 U.S. at 150-51; Settlegoode, 371 F.3d at 510.  The court must accept the jury's credibility findings consistent with the verdict . . . [and] may not substitute its view of the evidence for that of the jury.  Winarto, 274 F.3d at 1283.  A party cannot raise arguments in its post-trial motion for judgment as a matter of law under Rule 50(b) that it did not raise in its pre-verdict Rule 50(a) motion.  Freund v. Nycomed Amersham, 347 F.3d 752, 760-61 (9th Cir. 2003).

**2.     Rule 59(a).**

Rule 59(a) provides that a new trial may be granted to all or any of the parties and on all or part of the issues in an action in which there has been a trial by jury, for any of the reasons for which new trials have heretofore been granted in actions at law in the courts of the United States. A district court's denial of a motion for a new trial or to amend a judgment pursuant to Rule 59 is reviewed for an abuse of discretion.  See Far Out Productions, Inc. v. Oskar, 247 F.3d 986, 992 (9th Cir. 2001); Defenders of Wildlife v. Bernal, 204 F.3d 920, 928-29 (9th Cir. 2000).  A district court abuses its discretion when it bases its decision on an erroneous view of the law or a clearly erroneous assessment of the facts.  See Coughlin v. Tailhook Ass'n, 112 F.3d 1052, 1055 (9th Cir. 1997).

Rule 59 gives the trial judge the power to prevent what the judge considers to be a miscarriage of justice.  See Moist Cold Refrigerator Co. v. Lou Johnson Co., 249 F.2d 246 (9th Cir. 1957).  As such, a trial judge may grant a new trial if the verdict is contrary to the clear weight of the evidence, or is based upon evidence which is false, or to prevent a miscarriage of justice. Hangarter v. Provident Life & Accident Ins. Co., 373 F.3d 978, 1005 (9th Cir. 2004); United States v. 4.0 Acres of Land, 175 F.3d 1133, 1139 (9th Cir.1999); Roy v. Volkswagen of America, Inc., 896 F.2d 1174, 1176 (9th Cir. 1990); Air-Sea Forwarders, Inc. v. Air Asia Co., Ltd., 880 F.2d 176, 190 (9th Cir. 1989).  The burden rests on the party seeking the new trial to show prejudicial error.  See Malhiot v. Southern California Retail Clerks Union, 735 F.2d 1133, 137 (9th Cir. 1984); Corder v. Gates, 688 F.Supp. 1418, 1424 (C.D. Cal. 1988).

In considering a motion for a new trial, the court may weigh the evidence and assess the credibility of witnesses, and the court need not view the evidence in the light most favorable to the prevailing party.  See Air-Sea Forwarders, 880 F.2d 176.  However, it is not enough that the trial judge would have reached a different verdict from the jury.  See 4.0 Acres, 175 F.3d at 1139; Roy, 896 F.2d at 1176.  As explained in Landes, after weighing the evidence, the trial judge faces a difficult task:

> It may be doubted whether there is any verbal formula that will be of much use to trial courts in passing on motions [for a new trial on the grounds that the verdict is against the clear weight of the evidence].  Necessarily all such formulations are couched in broad and general terms that furnish no unerring litmus for a particular case.  On the one hand, the trial judge does not sit to approve miscarriages of justice.  His power to set aside the verdict is supported by clear precedent at common law and, far from being a denigration or a usurpation of jury trial, has long been regarded as an integral part of trial by jury as we know it.  On the other hand, a decent respect for the collective wisdom of the jury, and for the function entrusted to it in our system, certainly suggests that in most cases the judge should accept the findings of the jury, regardless of his own doubts in the matter. Probably all that the judge can do is to balance these conflicting principles in the light of the facts of the particular case.  If, having given full respect to the jury's findings, the judge on the entire evidence is left with the definite and firm conviction that a mistake has been committed, it is to be expected that he will grant a new trial.

Landes Const. Co., Inc. v. Royal Bank of Canada, 833 F.2d 1365, 1371-72 (9th Cir. 1987) (emphasis added) (citations and quotations omitted).  Doubts about the correctness of the verdict

1  are not sufficient grounds for a new trial: the trial court must have a firm conviction that the jury

2  made a mistake.  Landes Const., 833 F.2d at 1372 (citing Tennant v. Peoria & Pekin Union Ry.,

3  321 U.S. 29, 35 (1944)).

4                                    **III.   Background**

5         The parties are very familiar with the facts in this lawsuit.  Therefore, the Court will not

6  provide a lengthy narrative here.  Instead, what follows is only a brief summary of the factual and

7  procedural pillars that are relevant to Defendant's motions.  For a summary of the evidence that

8  was admitted and the factual narrative that was developed during the trial, Plaintiff and Defendant

9  both presented exhaustive narratives in their written briefs.  See Doc. No. 189-1 (Defendant's

10 motion brief); Doc. No. 195 (Plaintiff's opposition brief).

11 **1.      Factual summary**

12        Defendant is a large citrus farming company in California.  Defendant employed Plaintiff

13 as a farmer for nearly twenty-seven years.  Defendant also employed David Krause as its

14 president, Doug Carman as its vice president, and Emmet Dietz and Jim Hatakeda as farmers.

15        In the summer of 2017, Defendant tasked its accountant, Marie Desaulniers, to review

16 company expenses incurred by Plaintiff.  Desaulniers performed that review, and the results of the

17 review were shared with Krause.  In or around August 2017, Krause opened an internal

18 investigation that focused on Plaintiff.  Krause retained two investigators to perform the

19 investigation, Tom Goldman and Timothy Stehr.  The investigation consisted of Goldman and

20 Stehr interviewing several employees, including Dietz and Hatakeda.  Goldman and Stehr

21 prepared a written investigation report based on the interviews.  Krause oversaw the investigation

22 and communicated with the investigators during the investigation.

23        Krause decided on October 28, 2017, to terminate Plaintiff.  On October 31, 2017,

24 Goldman and Stehr interviewed Plaintiff for the first time during the investigation.  During the

25 interview, the investigators asked Plaintiff whether he would take a polygraph test.  Plaintiff

26 declined.  On the evening of November 1, 2017, Defendant sent two emails to 300 to 400

27 employees.  The first email states as follows:

28        From: "Garcia, Danny" <Dannv.Garcia@wonderful.com>

Date: November 1, 2017 at 7:01:20 PM PDT
To: "Garcia, Danny" <Dannv.Garcia@wondlerful.com>
Subject: IMPORTANT PERSONNEL ANNOUNCEMENT

Please see the message below from David Krause.

TO: ALL WONDERFUL CITRUS EMPLOYEES

Please be advised that effective immediately, James Jordan, Northern Ranch Manager for Wonderful Citrus, is no longer with the company.  All of James' former direct reports now report to Adam Brown.  Justin Goldring will be promoted to take over Adam's are as the Director of Southern Farming. Should anyone have any concerns or questions related to this leadership change, please contact Danny Garcia in Wonderful Citrus Human Resources.

David

Doc. No. 189-3 at 2-3.  The second email states as follows:

From: Garcia, Danny
Sent: Wednesday, November 01, 2017 7:42 PM
To: Garcia, Danny <Danny.Garcia@wonderful.com>
Subject: CONFIDENTIAL- INTERNAL INVESTIGATION ANNOUNCEMENT

Please see the announcement below from David Krause.

TO: ALL WONDERFUL CITRUS EMPLOYEES

As you may know, the Company is currently investigating allegations related to the improper use of Company resources and labor for personal use.  This includes work being conducted on personal property by Wonderful Citrus ("WC") employees and/or Farm Labor Contractor ("FLC") employees, then improperly billed to WC.  In addition, related to these alleged illegal actions, the Company is also investigating claims of intimidation and threatening conduct, as well as the use of inappropriate language of a racial/national origin nature.

The Company cares deeply about the safety, well-being and integrity of both our full-time and contracted employees, as well as our vendors.  As a result, we are in the process of conducting a thorough investigation into these matters.  We have already gathered physical evidence and have interviewed a number of current and former employees regarding the aforementioned allegations, including the falsification of employee timecards to reflect that work done by WC employees on personal property was being performed on WC properties. Although our investigation is ongoing, we have taken - and will continue to take - appropriate corrective measures (including, but not limited to, legal recourse) based on our findings.  The Company has no tolerance for any form of fraud or theft, or inappropriate language or intimidation that impacts our work environment.  Nor does the Company tolerate anyone who is not forthcoming and truthful with material

evidence or facts that would impact the course of our investigation in any way.

Accordingly, we need your assistance as we continue this investigation to ensure that our business always operates in a lawful, professional and ethical manner.  We ask that you please provide us with any information that may be relevant to our efforts, including if:

a. You have knowledge of work by Company employees on personal properties that was improperly billed to WC.
b. You have knowledge of work by FLC employees on personal properties that was improperly billed to WC.
c. You have knowledge of any intentional overbilling.
d. You have any knowledge of WC being charged for vendor services or materials (e.g. propane) for use on personal properties.
e. You have ever been asked to record or approve inaccurate information on a timecard, or to change a timecard; or if you are aware of others being asked to do so.
f. You have ever been threatened with job loss, or other negative consequences, if you reported improper conduct (such as misuse of Company resources or altered timecards).
g. You have witnessed the use of any inappropriate racial/national origin comments in the workplace.

Please immediately contact Danny Garcia in Wonderful Citrus Human Resources with any relevant information.  We will ensure that anyone who provides such information will be protected from retaliation for doing so.  If you have personally participated in any inappropriate activities, then we encourage you to come forward with the relevant information.  We will take into consideration your cooperation and candor when determining whether to pursue any corrective action.  Anyone who is found to have lied or knowingly provided false information during the investigation will be terminated immediately and the Company may pursue appropriate legal action.

In keeping with the Company's values, high ethical standards and commitment to employee well-being, we are taking immediate steps to ensure that we have a successful farming season and that proper management standards are practiced across all levels and areas of our organization.  Thank you for your assistance in this matter and for your continued dedication to our great company.

Sincerely,
David

Id. at 5-6.

**2.**     **Procedural summary.**

*A.*     *Lawsuit filed.*

Plaintiff filed this lawsuit against Defendant on March 23, 2018.  Plaintiff pleaded a claim

of defamation per se against Defendant.

### B.    Motion in limine concerning polygraph test.

Plaintiff filed a pretrial motion in limine to exclude evidence that Plaintiff declined to take a polygraph test.  The Court granted the motion, stating that the evidence was not relevant if Defendant did not base its decision to terminate Plaintiff on Plaintiff's refusal to take the polygraph test:

> THE COURT: Okay.  Polygraph tests, or at least the offer of a polygraph test, can be relevant in this case, if, for some reason, defense had based its termination decision to some extent on the refusal to take the test.  But I haven't seen enough evidence for me to determine that defense based its termination in any manner on the decision regarding the polygraph test.
>
> So at least at this point in time, I'm going to grant the motion.  If evidence comes out that a polygraph test was a factor in the termination decision, it is possible that I might allow it with a limiting instruction.

Doc. No. 104 at 27.

### C.    Sixteen-day jury trial.

The jury trial began on September 17, 2019.  Twenty-six witnesses testified.  The witnesses included Defendant's current and former employees, including Krause and Hatakeda; Defendant's investigators, Goldman and Stehr; Plaintiff and his close family members; and experts for both parties.  Approximately two dozen exhibits were admitted, including a redacted version of the investigation report.

During the trial, Defendant filed a Rule 50(a) motion for judgment as a matter of law on Plaintiff's defamation claim.  Defendant renewed the motion at the close of its case.  The Court denied the motion.  The case was submitted to the jury.

The jury reached a unanimous verdict.  See Doc. No. 167 (jury verdict).  The jury ruled in Plaintiff's favor on the defamation per se claim, answering the verdict questions as follows:

**Question No. 6:** The jury answered "Yes" to Question No. 6, which asked:

> Did Wonderful Citrus make one or more of the following statements to persons other than James Jordan: (a) 'James Jordan was involved in criminal activity by stealing from the company[;]' [or] (b) The email in Exhibit JT-1 in conjunction with the email in Exhibit JT-2 [i.e., the two emails quoted above].

Id.

**Question No. 7:** The jury answered "Yes" to Question No. 7, which asked: "Did the people to whom the statement/s were made reasonably understand that the statement/s was about James Jordan?"

**Question No. 8:** The jury answered "Yes" to Question No. 8, which asked: "Did these people reasonably understand the statement/s to mean that James Jordan had committed a crime?"

**Question No. 9:** The jury answered "No" to Question No. 9, which asked: "Was the statement/s substantially true?"

**Question No. 10:** The jury answered "Yes" to Question No. 10, which asked: "Did Wonderful Citrus fail to use reasonable care to determine the truth or falsity of the statement/s?"

**Question No. 11:** The jury answered "Yes" to Question No. 11, which asked: "Did Wonderful Citrus act with hatred or ill will toward James Jordan in making the statements, or did Wonderful Citrus have no reasonable grounds for believing the truth of the statements?"

**Question No. 12:** The jury answered "Yes" to Question No. 12, which asked: "Was Wonderful Citrus's conduct of making the statement/s a substantial factor in causing James Jordan actual harm?"

**Question No. 13(a)-(e):** The jury answered "$482,144" to Question No. 13(a), which asked: "Harm to James Jordan's property, business, trade, profession, or occupation?"  The jury answered "$0" to Question No. 13(b), which asked: "Expenses James Jordan had to pay as a result of the defamatory statements?"  The jury answered "$1,958,957" to Question No. 13(c), which asked: "Harm to James Jordan's reputation?"  The jury answered "$0" to Question No. 13(d), which asked: "Shame, mortification, or hurt feelings?"  The jury answered "$2,441,071" to Question 13(e), which asked: "TOTAL (add "a." through "d.")."

**Question No. 14:** The jury answered "$2,500,000" to Question No. 14, which asked: "What are the damages you award James Jordan for the assumed harm to his reputation and for shame, mortification, or hurt feelings?  You must award at least a nominal sum, such as one dollar."

## IV.   Analysis

**1.**     **Evidence that statements were made with malice.**

      *A.     Defendant's arguments.*

      There is insufficient evidence to support the jury's finding that Defendant acted with malice.  All of the allegedly defamatory statements[1] are subject to the common-interest privilege.  This means that Plaintiff had to prove that Defendant made the statements with malice.  To prove malice, Plaintiff had to prove that Defendant either published the statements out of hatred or ill-will toward Plaintiff or that Defendant had such a reckless or wanton disregard for the truth as to reasonably imply a willful disregard for or avoidance of accuracy.  There was no evidence at trial that Defendant willfully avoided learning the truth, much less that Defendant sent the emails in order to harm Plaintiff.  Defendant published the emails only following a lengthy investigation into whether Plaintiff committed misconduct, which gave Defendant reasonable grounds to believe that Plaintiff stole from the company.  Multiple witnesses told the investigators that Plaintiff instructed them to alter their timecards to remove expenses from Plaintiff's personal ranches and to charge Defendant for that work.  Multiple witnesses also stated that Plaintiff attempted to intimidate them into not cooperating with Defendant's investigation.  Therefore, Defendant had more than reasonable grounds to believe in the truth of the emails, meaning the emails are protected by the common-interest privilege as a matter of law.

      *B.     Discussion.*

      "The elements of a defamation claim are (1) a publication that is (2) false, (3) defamatory, (4) unprivileged, and (5) has a natural tendency to injure or causes special damage."  Jackson v. Mayweather, 10 Cal. App. 5th 1240, 1259-60 (2017) (citations and quotations omitted).  There are two types of defamation: libel and slander.  Cal. Civ. Code § 44.  "Libel is a false and unprivileged publication by writing, printing, picture, effigy, or other fixed representation to the eye, which exposes any person to hatred, contempt, ridicule, or obloquy, or which causes him to be shunned

---

[1]  According to Question No. 6, there are effectively two statements at issue.  First, the statement, "James Jordan was involved in criminal activity by stealing from the company."  Second, the statements in the two emails in Exhibit JT-1.  The verdict form did not require the jury to identify which of the two statements it found defamatory.  Therefore, it is not clear from the verdict form whether the jury found the first statement defamatory or the second statement (i.e., the two emails) defamatory or both statements defamatory.  For convenience, the Court will simply use the term "statements" to refer to the statement or statements that the jury found to be defamatory.

or avoided, or which has a tendency to injure him in his occupation." Id. at § 45.  Slander is a

"false and unprivileged publication, orally uttered, . . . which . . . [t]ends directly to injure him in

respect to his office, profession, trade or business, either by imputing to him general

disqualification in those respects which the office or other occupation peculiarly requires, or by

imputing something with reference to his office, profession, trade, or business that has a natural

tendency to lessen its profits . . . [w]hich, by natural consequence, causes actual damage." Id. at §

46.

    The Court previously concluded that Defendant's statements fall within California's

common-interest privilege, and Defendant agrees with that conclusion.  California's common-

interest privilege is "a conditional privilege against defamation to statements made without malice

on subjects of mutual interests." Hui v. Sturbaum, 222 Cal. App. 4th 1109, 1118-1119 (2014)

(citations omitted).  A statement that falls within the common-interest privilege includes one that

is made "[i]n a communication, without malice, to a person interested therein, (1) by one who is

also interested, or (2) by one who stands in such a relation to the person interested as to afford a

reasonable ground for supposing the motive for the communication to be innocent, or (3) who is

requested by the person interested to give the information." Cal. Civ. Code § 47(c).

    The plaintiff may defeat the common-interest privilege by showing that the statement was

made with malice. Hawran v. Hixson, 209 Cal. App. 4th 256, 288 (2012).  "'[M]alice' means that

the defendant (1) was motivated by hatred or ill will towards the plaintiff or (2) lacked reasonable

grounds for [its] belief in the truth of the publication and therefore acted in reckless disregard of

the plaintiff's rights." Schep v. Capital One, N.A., 12 Cal. App. 5th 1331, 1337 (2017) (citations

and quotations omitted).  "Inherent in the concept of reckless disregard for truth is the notion that

it is the speaker's belief regarding the accuracy of his or her statements, rather than the truth of the

underlying statements themselves, that is relevant to the malice determination." Noel v. River

Hills Wilsons, Inc., 113 Cal. App. 4th 1363, 1371 (2003).  Accordingly, "malice is not inferred

from the communication itself." Id. (citations and quotations omitted).  Instead, "[m]alice focuses

upon the defendant's state of mind, not his or her conduct." Id. (citations and quotations omitted).

    The Court concludes that there was adequate evidence at trial to support the finding that

Defendant acted with malice.  Taking the record in the light most favorable to Plaintiff and drawing all reasonable inferences in Plaintiff's favor, the following is a sampling of evidence and reasonable inferences upon which the jury could find that Defendant acted with malice:

1. For nearly twenty-seven years, Plaintiff was a very valuable employee who dedicated himself to helping Defendant's business interests.  See, e.g., Doc. No. 136 (Krause testimony); Doc. No. 152 (Carman testimony).

2. Krause intended for the investigation to be a pretextual basis for terminating Jordan.  In other words, the investigation was intended solely to reach the predetermined conclusion that Plaintiff stole from the company, despite available evidence suggesting otherwise.  See, e.g., Doc. No. 196-2 at 82-83 (Krause testimony); Doc. No. 189-4 at 80 (Krause email to Goldman: "Sounds good, I want to be able to fire people over this and possibly press charges against those involved."); id. (Krause email to Goldman: "We will definitely will get the smoking gun which should be enough to layoff One or two employees."); id. at 81 (Krause email: "Without actionable proof these moves would be difficult if not impossible.  For employees I have to have proof or in this state we will get sued."); id. at 82-83 (Goldman email to Krause: "I'm not sure in which directions to follow right now, But I will definitely come up with a plan how to incriminate them."); id. (Krause email: "I am not sure what proof you have but I hope its good enough that we can act on it quickly."); id. at 84 (Krause email to Goldman: "Very disappointing, how soon before you will have actionable material.  I want to be able to take him and any others out ASAP!"); Doc. No. 196-1 at 18 (Carman testimony: "And I didn't feel [the investigation] was being done in a fair, respectful way.  It was targeting people."); Doc. No. 196-8 at 17 (Desaulniers testifying that her investigation was "very focused on James Jordan").

3. During the investigation, Defendant's investigators exerted coercive pressure on witnesses in order to secure allegations against Plaintiff.  See, e.g., Doc. No. 189-4 at 81 (email from Goldman to Krause: "Also, I have a couple ideas to put some

pressure on those that involved with the kickbacks and don't want to talk to and to corporate with us, I need to break them up, separate them, there are in a comfort zone this must change."); id. (email from Goldman to Krause: "Can we layoff one or two employees that are involved in this catastrophe; Todd Consoalcio, Emett Dietz, Austin Williams, and few more, until we finished with the investigation, The idea is to put some pressure on a few of them so hopefully one of them will talk which will make it easier for us in the cleaning process. Q) how complicated is to layoff James Jordan."); Doc. No. 196-3 (Dietz testifying that he passed out when he was interviewed by Defendant's investigators, and testifying that his integrity was attacked by the investigators, and testifying that Krause said to him that "they had pretty much proved that [Plaintiff] had stolen from the company").

4.  The investigation was "irrational, unfair, disrespectful."  See, e.g., Doc. No. 196-1 at 18 (Carman testifying: "When all of this was going on, I have never seen the company behave in an irrational, unfair, disrespectful manner, and I assumed that if there was anything to this and I, like I said before, is that I didn't have a problem with the company doing an investigation, but it should be done — it should be done in a fair, respectful way.  And I didn't feel it was being done in a fair, respectful way.  It was targeting people."); Doc. No. 512 at 33 (Carman testifying: "I think that it — that if you're going to do an investigation, it should be done in an unbiased way where the people that are being investigated that were long-term employees of the company that did good work should be treated with proper respect so they have their dignity, and they should be asked appropriate questions and not be accused of being liars and thieves."); Doc. No. 152 at 6 (Carman testifying that he quit his job with Defendant because of his disapproval of the investigation: "My decision didn't have to do with why there was an investigation. It was how the investigation that was conducted caused me to not want to be a part of anything going forward.  There were things that were done there that I just couldn't be a part of.  I didn't want to represent and leave an impression on the

people that were left behind that I was supportive of anything that was being done."); Doc. No. 196-2 at 18 (Krause testifying that the investigation "wasn't as honorable as it should have been" and he was aware that employees felt "like they were mistreated" during the investigation).

5. During the investigation, Krause knew that the investigation was being handled improperly.  See, e.g., Doc. No. 196-2 at 17 (Krause testifying that Carman told Krause that "he didn't like the way the investigation was taking place").

6. The investigation into Plaintiff's personal ranch expenses was unreasonable and reckless because it did not consider the total costs that Plaintiff incurred on his personal ranch.  See, e.g., Doc. No. 196-2 at 57, 90 (Krause testimony).

7. The investigators elected to not record the interviews with the witnesses, and the investigators never provided the witnesses with copies of the written witness reports so that the witnesses could review the reports for accuracy.  See, e.g., Doc. No. 196-2 at 19 (Krause testimony).

8. The investigators did not accurately report or characterize the witness interviews in the investigation report.  See, e.g., Doc. No. 196-7 at 11 (Loera testimony); Doc. No. 196-3 at 22-23 (Dietz testimony).

9. The investigation was seriously flawed and reckless.  See, e.g., Doc. No. 196-8 at 27 (Desaulniers testifying that she never spoke with "any of the actual people involved in the process . . . to find out how it worked in terms of reporting time"); id. at 12, 27 (Desaulniers testifying that the limited scope of her investigation precluded her from conducting a more accurate investigation); Doc. No. 196-10 at 7 (testimony that the investigators had no experience or training with "the citrus industry or how labor time is reported or how [Defendant] conducted its accounting of expenses," despite the fact that the alleged focus of the investigation was on labor time reporting in the citrus industry).

10. Defendant tried to keep the investigation a secret from Plaintiff.  See, e.g., Doc. No. 189-4 at 87 (Krause email: "Today we had this investigation get exposed . . . .").

11. Krause wanted to terminate Plaintiff even before the investigation report was finalized and even before the investigators spoke to Plaintiff.  See, e.g., Doc. No. 196-2 at 8-9 (Krause testimony); Doc. No. 186 at 14 (Stehr testimony).

12. Krause told Dietz that Plaintiff was involved in criminal activity, and Cooper indicated to Dietz that Plaintiff was involved in criminal activity.  Doc. No. 189-3 at 74 (Dietz testimony).

13. Defendant published the email about "allegations related to the improper use of Company resources and labor for personal use" to 300 to 400 people, and Defendant did so immediately after Defendant published to the same 300 to 400 people the email about Plaintiff's employment termination.  See Doc. No. 189-3 at 2-6 (emails); Doc. No. 196-2 at 38 (Krause testimony).

14. Plaintiff never stole from Defendant.  Doc. No. 189-6 (Plaintiff testimony).

An "accumulation" of evidence and "appropriate inferences" drawn therefrom may show malice.  Fisher v. Larsen, 138 Cal. App. 3d 627, 640 (1982).  Here, the foregoing evidence and reasonable inferences adequately support the jury's finding that Defendant acted with malice when it published the statements.  For example, there was adequate evidence allowing the jury to find that Defendant "lacked reasonable grounds to believe the [statements were] true, and therefore acted with a reckless disregard for the rights of [Plaintiff]."  Kashian v. Harriman, 98 Cal. App. 4th 892, 931 (2002).  Framed slightly differently, there was adequate evidence for the jury to find that Defendant's publication of the statements was motivated by a "cause other than the desire to protect the interest for the protection of which the [common-interest] privilege is given."  Brewer v. Second Baptist Church of Los Angeles, 32 Cal. 2d 791, 797 (1948).

**2.**      **Evidence of false published statement.**

   *A.*      *Defendant's arguments.*

There was no evidence at trial that Defendant published any provably false statements of fact, much less that Defendant made any statements that were defamatory on their face.  The two emails cannot support a defamation per se claim as a matter of law because: (1) every statement in them is true; (2) no defamatory interpretation is possible without knowledge of extrinsic facts; and

1  (3) the doctrine of defamation by "implication" is inapplicable to a claim for defamation per se.

2  Additionally, no witness testified that any representative of Defendant specifically stated that

3  "James Jordan was involved in criminal activity by stealing from the company."

4       ***B.    Discussion.***

5       The Court concludes that there was adequate evidence at trial to support the finding that

6  Defendant published a statement that was defamatory on its face.

7            ***(i.)    Defamation by implication.***

8       First, the Court rejects Defendant's contention that the two emails cannot support

9  Plaintiff's defamation claim.  An overview of California's libel law is warranted.  "The definition

10 of libel — a false and unprivileged publication which exposes any person to hatred, contempt,

11 ridicule, or obloquy, or which causes him to be shunned or avoided, or which has a tendency to

12 injure him in his occupation — assumes that the reader of a libel will recognize it as such."

13 Barnes-Hind, Inc. v. Superior Court, 181 Cal. App. 3d 377, 386 (1986) (citing Cal. Civ. Code §

14 45, quotations omitted).  "If no reasonable reader would perceive in a false and unprivileged

15 publication a meaning which tended to injure the subject's reputation in any of the enumerated

16 respects, then there is no libel at all."  Id.  "If such a reader would perceive a defamatory meaning

17 without extrinsic aid beyond his or her own intelligence and common sense, then (under [Cal. Civ.

18 Code § 45a]) there is a libel per se."  Id. at 386-87.  "But if the reader would be able to recognize a

19 defamatory meaning only by virtue of his or her knowledge of specific facts and circumstances,

20 extrinsic to the publication, which are not matters of common knowledge rationally attributable to

21 all reasonable persons, then . . . the libel cannot be libel per se but will be libel per quod."  Id. at

22 387.  Stated slightly differently,

23
24
25
26
27
28
       Libel per se is distinguished from libel per quod in Civil Code
       section 45a: A libel which is defamatory of the plaintiff without the
       necessity of explanatory matter, such as an inducement, innuendo or
       other extrinsic fact, is said to be a libel on its face.  Defamatory
       language not libelous on its face is not actionable unless the
       plaintiff alleges and proves that he has suffered special damage as a
       proximate result thereof.  Special damage is defined in Section 48a
       of [Civil Code].  The definition: Special damages are all damages
       which plaintiff alleges and proves that he has suffered in respect to
       his property, business, trade, profession or occupation, including
       such amounts of money as the plaintiff alleges and proves he has

expended as a result of the alleged libel, and no other.

Id. at 382 (citations and quotations omitted).  "The purpose of the rule requiring proof of special damages when the defamatory meaning does not appear on the face of the language used is to protect publishers who make statements innocent in themselves that are defamatory only because of extrinsic facts known to the reader."  Id. at 387 (citations omitted) (emphasis in original).

A "strong example" of libel per quod is Morrison v. Ritchie & Co., 4 F. 645 (Scot. 1902).  Leslie Yalof Garfield, The Death of Slander, 35 Colum. J.L. & Arts 17, 25 n.45 (2011).  In that case, the defendant newspaper published reports that the plaintiff had given birth to twins.  This publication, on its face, would not be considered damaging to the plaintiff's reputation.  But the community knew that the plaintiff was unmarried — an extrinsic fact not included in the published statement — which made the statement defamatory as libel per quod.

Defendant argues that Plaintiff's theory of defamation for the two emails is, as a matter of law, a theory for libel per quod.  Defendant is incorrect.  Plaintiff's theory was that the two emails, on their face and without proof of extrinsic facts, were libelous.  This is a theory for libel per se.  The California Supreme Court demonstrates this point in MacLeod v. Tribune Pub. Co., 52 Cal. 2d 536 (1959), where it stated:

> To constitute a libel it is not necessary that there be a direct and specific allegation of improper conduct, as in a pleading.  The charge may be either expressly stated or implied; and in the latter case the implication may be either apparent from the language used, or of such a character as to require the statement and proof of extrinsic facts (inducement, colloquium, and innuendo) to show its meaning.  In the last case, proper allegations and proofs of the facts necessary to make the meaning of the language apparent will be required.  Otherwise, whether the charge be directly made or merely implied, the publication — without averment, colloquium, or innuendo — will, in itself, constitute a libel.

MacLeod, 52 Cal. 2d at 548-49 (emphasis added).  This explication from MacLeod is important because it highlights the principle that a defamatory statement may be implied, and the implication may be apparent on the face of the statement.  This principle was the basis of Plaintiff's defamation theory for the two emails: the two emails contained an implied defamatory meaning — i.e., Plaintiff committed a crime — and that implication is apparent on the face of the emails.  For this reason, it is not true, as Defendant contends, that the claim of defamation by implication is unavailable to Plaintiff simply because Plaintiff pleaded a claim for defamation per se, as opposed

to defamation per quod.

Defendant refers to "innuendo," but that is a distinct legal principal that does not apply to libel per se. Innuendo relates to libel per quod, with the innuendo being a separate allegation of the statement's defamatory meaning, which must be pleaded to support a claim of libel per quod. Id. at 548-49 ("[I]mplication may be either apparent from the language used, or of such a character as to require the statement and proof of extrinsic facts (inducement, colloquium, and innuendo) to show its meaning. In the last case, proper allegations and proofs of the facts necessary to make the meaning of the language apparent will be required.") (emphasis added); see also Gregory v. McDonnell Douglas Corp., 17 Cal. 3d 596, 603-604 (1976).

For similar reasons, Defendant is also incorrect when it argues that a "defamation by implication claim . . . required pleading of extrinsic circumstances giving meaning to the alleged offending passage." Doc. No. 189-1 at 35 (Defendant's motion brief citing and quoting Forhser v. Bugliosi, 26 Cal. 3d 792, 806 (1980)). Defendant relied on Forhser to make this argument, but Defendant's reliance on Forhser is either seriously confused or disingenuous. The full quote from Forhser states: "To bolster his pleadings, and, apparently in an attempt to plead extrinsic circumstances giving meaning to the alleged offending passages, appellant alleged certain 'omitted facts' which did not find their way into the book. However, appellant's position is not appreciably improved thereby." Forsher, 26 Cal. 3d at 806. This language from Forsher clearly does not support the proposition that defamation by implication requires pleading extrinsic circumstances.

The Court also rejects Defendant's contention that "[a]bsent independent or intrinsic knowledge, an average person reading the emails would not be able to recognize a defamatory meaning" from the two emails." Doc. No. 189-1. Defendant sent the second email approximately forty minutes after the first email, and Defendant sent both emails in the evening, well after standard business hours. The first email states that Plaintiff's employment with Defendant is terminated: "Please be advised that effective immediately, James Jordan . . . is no longer with the company." Doc. No. 189-3 at 2-3. The second email states, amongst other things, that (1) "the Company is currently investigating allegations related to improper use of Company resources," (2) "related to these alleged illegal actions, the Company is also investigating claims of intimidation

and threatening conduct, as well as the use of inappropriate language of a racial/national origin

nature," (3) "[w]e have already gathered physical evidence and have interviewed a number of

current and former employees regarding the aforementioned allegations, including the falsification

of employee timecards to reflect that work done by WC employees on personal property was

being performed on WC properties," and (4) "[t]he Company has no tolerance for any form of

fraud or theft."  From these two emails alone, a reasonable factfinder could infer the defamatory

implication that Plaintiff committed a crime.  See Forsher, 26 Cal. 3d at 806 ("[T]he test as noted

above is whether by reasonable implication a defamatory meaning may be found in the

communication.").

In a related vein, the Court also rejects Defendant's unsupported argument that "[a]

defamation per se claim cannot be based on statements containing multiple statements of fact,

some of which may be true or false, and some of which could support a claim for either

defamation per se or defamation per quod."  Doc. No. 1891-1 at 34.  Evidence that part of a

defamatory publication is true does not automatically bar liability, and the plaintiff is entitled to

recover damages for any material part of a defamatory publication that is not true, including a

defamatory implication.  See Shumate v. Johnson Pub. Co., 139 Cal. App. 2d 121, 132 (1956) ("It

is no defense that merely a part of a publication is true.  In determining whether a publication is

libelous, it must be considered in its entirety.  It may not be divided into segments and each part

treated as a separate unit. . . .  If any material part be not proved true, the plaintiff is entitled to

damages in respect to that part."); see also Wilbanks v. Wolk, 121 Cal. App. 4th 883, 901-02

(2004) ("That a publication states a truth, however, does not insulate the publication as a whole

from a claim of defamation. . . .  The ultimate question is whether a reasonable trier of fact could

conclude that the published statements imply a provably false factual assertion.") (citations

omitted); Gantry Constr. Co. v. American Pipe & Constr. Co., 49 Cal. App. 3d 186, 194-196

(1975); Kapellas v. Kofman, 1 Cal. 3d 20, 33 (1969) ("We have long recognized that false

inferences or implications raised by the arrangement and phrasing of apparently non-libelous

statements can be as injurious as explicit epithets; we have upheld libel actions founded on such

implications.  When the basis of a claim of libel lies in an implication flowing from the rhetoric of

a publication, the allegedly damaging implication frequently cannot be connected to any one

statement, or to even a few specific statements, but rather emanates from the tone of the article as

a whole.") (citations omitted).

Next, Defendant's reliance on <u>Ringler Assocs. Inc. v. Maryland Cas. Co.</u>, 80 Cal. App. 4th

1165 (2000) and <u>Milkovich v. Lorain Journal Co.</u>, 497 U.S. 1 (1990) is misplaced.  There the

courts were discussing defamation law as it relates to statements of opinion that imply a

knowledge of facts.  That is inapplicable here because the two emails do not include statements of

opinion.

Defendant's reliance on <u>Charney v. Standard Gen., L.P.</u>, 10 Cal. App. 5th 149 (2017) is

also misplaced.  There the plaintiff, Charney, brought a defamatory implication claim against his

former employer because the former employer published the following press release:

> As we have stated previously, our objective is to help American
> Apparel grow and succeed.  We supported the independent, third-
> party and very thorough investigation into the allegations against
> Mr. Charney, and respect the Board of Directors' decision to
> terminate him based on the results of that investigation.

<u>Charney</u>, 10 Cal. App. 5th at 152 (2017).  The plaintiff in <u>Charney</u> argued that "the press release

gave the impression he was terminated for committing 'financial malfeasance,' 'illegal sexual

harassment,' and 'discrimination.'"  <u>Id.</u> at 158 n.9 (2017).  The court rejected that argument, but

only because the court saw "nothing in the press release to support this allegation."  <u>Id.</u>  This is to

say, the press release said nothing about financial malfeasance, illegal sexual harassment, or

discrimination.  Here, however, the defamatory implication that Plaintiff committed a crime comes

directly from the express language in second email, which states "improper use of Company

resources," "illegal actions," "falsification of employee timecards," "fraud," and "theft."

### (ii.)   *Express statement of criminal activity by stealing.*

Defendant argues that there is no evidence to support a finding that Defendant stated,

"James Jordan was involved in criminal activity by stealing from the company."  Plaintiff's

response to this argument, like many other sections and arguments in Plaintiff's opposition brief,

is unhelpful because it fails to directly address the issue raised by Defendant.  But what is clear

from Plaintiff's response is that Plaintiff cannot point to any evidence showing that Defendant

1    stated, "James Jordan was involved in criminal activity by stealing from the company."

2           Nonetheless, the emails alone are enough to support the jury's verdict on the defamation

3    claim, so this issue does not require judgment as a matter of law or a new trial.  Additionally, it is

4    worth noting that there is evidence that Krause told Dietz that Plaintiff was involved in criminal

5    activity, and Cooper indicated to Dietz that Plaintiff was involved in criminal activity.  See Doc.

6    No. 189-3 at 74 (Dietz testimony).

7    **3.**        **Evidence that statements caused damage.**

8           *A.*        *Defendant's arguments.*

9           Plaintiff failed to prove that any of the statements were a substantial factor in causing

10   damages to Plaintiff.  The jury awarded damages based on Plaintiff's employment termination and

11   supposed inability to obtain a new job.  But there is no evidence that the statements were

12   published to anyone in the community, which in turn means there is no evidence that the awarded

13   damages were caused by the statements.

14          *B.*        *Discussion.*

15          "Alleged income-related damages accruing from a defamatory statement must be

16   supported by competent evidence showing that damages were suffered because of the statement."

17   Gottlieb v. Fahs, 2012 WL 5310004, at *16 (Cal. Ct. App. Oct. 29, 2012) (citing Cunningham v.

18   Simpson, 1 Cal. 3d 301, 309 (1969)).  However, the plaintiff of a defamation per se claim "need

19   not prove special damages: [d]amage to plaintiff's reputation is conclusively presumed and he

20   need not introduce any evidence of actual damages in order to obtain or sustain an award of

21   damages including, in an appropriate case, punitive damages."  Barnes-Hind, Inc. v. Superior

22   Court, 181 Cal. App. 3d 377, 382 (1986) (citations and quotations omitted).

23          The Court concludes that the award of actual damages was supported by adequate

24   evidence.  First, the jury awarded defamation damages to Plaintiff for both "actual" damages and

25   "assumed" damages.  For actual damages, the jury awarded Plaintiff $482,114 for "[h]arm to

26   [Plaintiff's] property, business, trade, profession, or occupation," and $1,958,957 for "[h]arm to

27   [Plaintiff's] reputation," which together totals $2,441,071.  Doc. No. 167.  The following is just

28   some of the evidence supporting the finding that the emails caused $2,441,071 in actual damages:

1.  Before Defendant published the two emails, Plaintiff received two or three job offers a year.  <u>See</u> Doc. No. 196-4 at 12-14 (Plaintiff testimony).

2.  Defendant published the emails to 300 to 400 recipients.

3.  Defendant did not tell the recipients of the first email to not disclose the contents of the email.

4.  After the emails were published, people in the community not affiliated with or employed by Defendant heard that Plaintiff was fired for stealing from the company. <u>See</u> Doc. No. 189-3 at 69-70 (Carman testimony).

5.  After the emails were published and after Plaintiff was terminated, Plaintiff received only one job interview and one job offer despite actively seeking new employment. Doc. No. 196-4 at 12-14 (Plaintiff testimony).

6.  Plaintiff's forensic economist expert, Stephanie Rizzardi, testified that Plaintiff incurred $2,441,071 in damages, which included lost past and future salary and benefits, caused by being "prevent[ed] . . . from getting reemployed." <u>See</u> Doc. No. 179; <u>see also id.</u> at 50 (Rizzardi testifying that the actual damages of $2,441,071 are based on the "loss to [Plaintiff] because of the reputation that has been taken away from him," and the "defamation issue . . . basically freezes [Plaintiff] out of the citrus industry).

Second, "[t]he originator of a defamatory statement may be liable for the republication by a third party [if] . . . the repetition was reasonably to be expected." <u>Bryan v. News Corp.</u>, 2018 WL 720057 (Cal. Ct. App. 2018).  One form of a "reasonably expected" republication is a republication by a third party that "was the natural and probable consequence of the original speaker's disclosure." <u>Id.</u>  A reasonable inference that could be drawn from the foregoing evidence is that some of the 300 to 400 recipients of the emails — all of whom were members in some form of the local farming and citrus community — republished the statements and defamatory implications of the statements to others in the farming and citrus community, which in turn damaged Plaintiff's reputation and ability to secure a new job.  It is neither unnatural nor improbable that such republication occurred when considering, first, the large number of recipients

1  of the emails, second, the first email's non-confidentiality, and, third, Plaintiff's stature in the

2  farming and citrus community.

3  **4.    Duplicative damage award.**

4         *A.    Defendant's arguments.*

5         The award of $2,500,000 for assumed damages for harm to Plaintiff's reputation and for

6  shame, mortification, or hurt feelings is duplicative of the award of $2,441,071 for actual

7  damages, which included an award of $1,958,975 for harm to Plaintiff's reputation.  In addition,

8  the jury's verdict failed to account for the fact that Plaintiff turned down a job offer, which was a

9  violation of Plaintiff's duty to mitigate his damages.

10        *B.    Discussion.*

11        The Court concludes that the assumed damages award is not duplicative of the actual

12 damages award.  As stated above, the jury awarded $2,441,071 in actual damages, which included

13 $1,958,957 for reputational harm.  As for assumed damages, the jury awarded $2,500,000 for

14 assumed harm to reputation, shame, mortification, or hurt feelings.  Under California defamation

15 law, "special damages are damages which a plaintiff suffers to his property, business, trade,

16 profession or occupation caused by this 'libelous stain' or injury to his reputation," O'Hara v.

17 Storer Commc'ns, Inc., 231 Cal. App. 3d 1101, 1121 (1991); see also Cal. Civ. Code § 45a(d)(1);

18 Galarneau v. Merrill Lynch, Pierce, Fenner & Smith Inc., 504 F.3d 189, 204 (1st Cir. 2007)

19 (special damages include actual harm directly caused by loss of reputation where the potential

20 employer failed to hire the plaintiff because of the defamatory taint on the plaintiff's reputation),

21 which in this case would include the jury's actual damages award.  By contrast, general damages

22 mean damages for shame, mortification, and hurt feelings, Cal. Civ. Code § 45a(d)(2), which are

23 more difficult to quantify.  In light of this law, the Court is not convinced that the jury's assumed

24 damages award is duplicative of the special damages award.  Simply because both awards

25 approximate $2,500,000 does not show that the awards are duplicative.  Rather, the fact that the

26 jury awarded the precise figure of $2,441,071 for actual damages strongly suggests that this

27 amount was directly linked to provable economic and reputational harm, whereas the fact that the

28 jury awarded the even figure of $2,500,000 for assumed damages suggests that this amount was an

approximation of assumed damages for harm to Plaintiff's reputation.  Moreover, the contrast between the two awards is even starker when comparing only the reputational damages components: the jury awarded the specific amount of $1,958,957 for actual reputational damages, which cannot reasonably be said to mirror the even amount of $2,500,000 for assumed reputational damages.

The Court also rejects Defendant's contention that the jury's award of assumed damages duplicates the same category of harm — i.e., reputational harm — that is compensated for by the jury's award of actual damages.  This contention is flawed because there is a distinction between actual reputational harm and assumed reputational harm, and the jury was properly permitted to compensate Plaintiff for both types of reputational harm.  See Di Giorgio Fruit Corp. v. Am. Fed'n of Labor & Cong. of Indus. Organizations, 215 Cal. App. 2d 560, 577 (1963).

Finally, the Court rejects Defendant's argument that a plaintiff of a defamation claim may not receive "large" awards for both actual reputational harm and assumed reputational harm, and this is because Defendant cited no compelling authority for this argument.

**5.     Mitigation question on verdict form.**

*A.     Defendant's arguments.*

The Court should order a new trial because the verdict form did not include a mitigation question, which was necessary for the jury to find whether Plaintiff mitigated his damages.

*B.     Discussion.*

The Court concludes that the verdict form's omission of a mitigation question does not warrant a new trial.  First, the Court properly instructed the jury on the law of mitigation.  The Court instructed:

> James Jordan is not entitled to recover damages for economic losses that Wonderful Citrus proves James Jordan could have avoided by returning to gainful employment as soon as it was reasonable for him to do so.
>
> To calculate the amount of damages you must:
>
>> 1. Determine the amount James Jordan would have earned from the job he held at the time he was discharged; and
>>
>> 2. Subtract the amount James Jordan earned or could have

> earned by returning to gainful employment.
>
> The resulting amount is James Jordan's damages for past lost earnings.

Doc. No. 166 at 32.  This instruction was sufficient.  See Advanced Bodycare Sols., LLC v. Thione Int'l, Inc., 615 F.3d 1352, 1362 n.22 (11th Cir. 2010) ("[The jury did receive an instruction on mitigation of damages . . . .  Whether the court should have gone one step further and included the interrogatory . . . in the verdict form was a matter committed to the court's discretion.").

Second, Defendant argues that the mitigation instruction created prejudicial ambiguity for the jury because the Court gave the instruction after the instructions on Plaintiff's claim for breach of contract.  This means, according to Defendant, that the jury did not know that the instruction applied to the defamation claim, as well.  The Court rejects this argument.  For one, the mitigation instruction does not state that it applies only to the contract claim.  For another, if Defendant's sequence-of-instruction argument were to be accepted, then it would be virtually impossible for a trial judge to give jury instructions in a sequence that did not create some prejudicial ambiguity.  See United States v. Marques, 600 F.2d 742, 749 (9th Cir. 1979) (rejecting the appellant's sequence-of-instruction argument for new trial).

Third, before the Court gave the verdict form to the jury, the Court conducted a hearing with Defendant and Plaintiff to discuss the verdict form.  Defendant failed to demonstrate in its motion brief that Defendant objected at that hearing to the omission of a mitigation question.

## 6.   Exclusion of evidence.

### A.   Defendant's arguments.

The Court should order a new trial because it did not allow Defendant to present highly relevant and probative evidence, including (1) the complete and unredacted investigation report; and (2) evidence that Plaintiff refused to take a polygraph test even though Plaintiff was allowed to introduce evidence of Hatakeda's willingness to take a polygraph test.

As for the investigation report, the Court should have admitted the entire unredacted investigation report because the redacted portions of the report that was admitted contained highly-relevant evidence bearing directly on Defendant's state of mind when it published the emails, which in turn bears on whether Defendant acted with malice.  Because the Court excluded

the redacted portions of the investigation report, Plaintiff was able to present an incomplete picture of Defendant's investigation, and key inculpatory statements about Plaintiff in the report were excluded from the jury.  For example, Plaintiff's counsel falsely stated in closing argument that Defendant did not give Plaintiff a chance to speak with the investigators before Defendant published the two emails, but a redacted portion of the report shows that the investigators interviewed Plaintiff before Defendant published the emails.

As for the polygraph test, the Court also should have allowed Defendant to present evidence about Plaintiff's refusal to take a polygraph test.  Plaintiff's refusal to take a polygraph test was relevant and admissible because it bore on whether Defendant acted out of hatred or ill will or in reckless disregard for the truth when it sent the two emails.  Moreover, even if Plaintiff's refusal to take a polygraph test was irrelevant or unduly prejudicial, Plaintiff opened the door to this evidence when he himself introduced other polygraph-related evidence at trial.  For example, Plaintiff's counsel repeatedly referenced Hatakeda's initial statement that he was willing to take a polygraph examination.  Therefore, it is unfair that Plaintiff was allowed to argue that Defendant should have given Hatakeda's initial statement more weight because Hatakeda was willing to take a polygraph test while hiding the fact that Plaintiff refused to take a polygraph test.

## B.    Discussion.

The Court concludes that the admission of the redacted version of the investigation report, as opposed to the unredacted version of the report, does not warrant a new trial.  First, the Court permitted Defendant and Plaintiff to discuss and reach an agreement on the admission of the investigation report.  Accordingly, Defendant and Plaintiff stipulated to the admission of the redacted version of the investigation report, with the redactions being chosen by the parties, not the Court.  Then, upon the parties' motion, the Court admitted into evidence the redacted version of the investigation report.  The trial transcript from the seventh day of trial states as follows:

> THE COURT: Okay.  Great.  Okay.  Let me just mention, with the investigative report, if both sides are able to come to an agreement with respect to a redaction that would be admitted, you can mark it however you want to mark it as a joint exhibit, you can do that.  If you want to do it plaintiff's or defendant's exhibit, you can do that.  However you want to mark it, as long as you're both aware of how it is marked, then that's fine with the Court.  And if you both agree

on a redacted version of the investigative report, either party can move it into — can request it be moved into evidence, and I will do that.

DEFENDANT'S COUNSEL: Your Honor, we have no problem having it be a joint report. . . .

. . . .

THE COURT: All right.  Anything before we have the jury come in?

PLAINTIFF'S COUNSEL: No.  We're fine, your Honor.

THE COURT: Defense?

DEFENDANT'S COUNSEL: Yes, your Honor.  I believe the parties have agreed to Exhibit CP in its redacted form.  So we have copies for the Court which I can provide now.

THE COURT: Sure.

DEFENDANT'S COUNSEL: I think the only issue was a confidential at the bottom which when we publish it will be redacted.

THE COURT: Anything else, defense?  Oh, yeah, sure go ahead.

DEFENDANT'S COUNSEL: And we would ask that that exhibit be moved into evidence now at this time.

THE COURT: All right.

PLAINTIFF'S COUNSEL: I was going to do that during the course of my examination of Mr. Stehr, your Honor.

. . . .

THE COURT: Okay. That's fine, sure.

DEFENDANT'S COUNSEL: The only thing we would ask is that the entirety of the report be admitted into evidence rather than just piecemeal sections of it.

PLAINTIFF'S COUNSEL: Yeah.

DEFENDANT'S COUNSEL: I just wanted to make sure that the entirety of the report.

PLAINTIFF'S COUNSEL: That's what I intend on doing.

THE COURT: Defendant's Exhibit CP, the entirety, will be admitted when request.  Okay.  We'll have the jury come in.

Doc. No. 205 at 4, 11-12.  In light of Defendant's stipulation to the admission of the redacted

version of the investigation report, Defendant waived the argument that the Court should have

admitted the unredacted version of the report.

Second, Defendant failed to show the Court where, exactly, in the trial transcript the Court

excluded the admission of the unredacted investigation report.  It is true that before Defendant and

Plaintiff stipulated to the redacted version of the investigation report, Defendant and Plaintiff

quarreled over the admissibility of the investigation report.  But because Defendant did not

provide the Court with a citation to the Court's exclusion of the unredacted investigation report,

the Court rejects Defendant's argument because the Court cannot analyze the context in which the

alleged exclusion occurred.

Third, the jury's inability to consider the redacted portions of the investigation report did

not substantially prejudice Defendant.  Defendant contends that the redacted portions of the

investigation report "bear[] directly on what [Defendant] knew at the time it made the challenged

statements [e.g., the emails], and therefore whether [Defendant] acted with malice."  Doc. No.

189-1 at 46.  But Defendant failed to demonstrate or discuss whether other evidence, such as

Defendant's many witnesses, were incapable of proving Defendant's state of mind when the

emails were published.  This is not surprising because other evidence was admitted showing

Defendant's state of mind when the emails were published, including testimony from Krause.

Additionally, the question of whether Defendant spoke with Plaintiff before the emails were

published was answered by multiple witnesses, including Krause, the investigators, and Plaintiff.

Fourth, the redactions in the investigation report did not prejudicially distort the meaning

of the investigation report.  Rule 106 of the Federal Rules of Evidence states, "If a party

introduces all or part of a writing or recorded statement, an adverse party may require the

introduction, at that time, of any other part — or any other writing or recorded statement — that in

fairness ought to be considered at the same time."  Fed. R. Evid. 106.  But Rule 106 does not mean

that an entire writing or recording is automatically admissible whenever part of it is introduced.

Rule 106 is a very narrow remedy.  As the Third Circuit put it, the remainder of a writing or

recording is admissible under Rule 106 only when "necessary to (1) explain the admitted portion,

(2) place the admitted portion in context, (3) avoid misleading the trier of fact, or (4) insure a fair

and impartial understanding." United States v. Soures, 736 F.2d 87, 91 (3d Cir. 1984).  Moreover, the proffered remainder is only admissible if it corrects the misimpression.  As the Seventh Circuit stated, "the trial judge need only admit the remaining portions of the statement which are needed to clarify or explain the portion already received."  United States v. Haddad, 10 F.3d 1252, 1259 (7th Cir. 1993).  Therefore, the rule is intended to prevent a party from achieving an unfair result by introducing all or part of a writing or recording that, because of its selectivity, is subject to misinterpretation.

Defendant invokes Rule 106 to argue that the redacted portions of the investigation report, including redacted statements suggesting that Plaintiff was involved in theft from the company, were relevant to Defendant's defenses.  But Defendant has not shown that the redacted portions of the investigation report created an unfair or impartial understanding of the investigation report or the investigation.  Defendant presented extensive evidence — including testimony from Krause, the investigators, and interviewed witnesses — in an attempt to show that the investigation was driven by concerns that Plaintiff was stealing from the company.  Additionally, nearly all of the redactions were of entire sections of the report, as opposed to specific sentences or phrases or words within sections.  For example, the redactions covered the entire table of contents, the entire section entitled "Employees and Vendors of Interest," the entire section entitled "Memo Regarding Discrepancies," the entire section about the interview with Dan Spalding, the entire section about the interview with Rene Flores, the entire section about the interview with Bill Memory, and the entire section about the interview of Plaintiff (with the exception of the section's title, "Tuesday, October 31, 2017, At 1:20 pm we conducted an interview with James Jordan").  Therefore, when the redactions are viewed in context with the unredacted content, the Court concludes that the redactions do not create misleading inferences that threaten a fair and impartial understanding of the report.

The Court also concludes that the exclusion of evidence about Plaintiff's refusal to take a polygraph test does not warrant a new trial.  The Ninth Circuit has indicated that polygraph evidence can be relevant and admissible when the polygraph evidence is being offered not to prove the truth of the polygraph test results but, instead, to prove that the polygraph test was

offered or administered:

> It is well settled in this circuit that polygraph evidence is disfavored and cannot be introduced into evidence to establish the truth of the statements made during the examination.  Thus, if the evidence is being offered to prove the truth or falsity of the polygraph results, then the evidence is inadmissible.  However, polygraph evidence which is an operative fact may be admissible.
>
> The key to its admissibility as an operative fact is the purpose for which it is being introduced.  If the polygraph evidence is being introduced because it is relevant that a polygraph examination was given, regardless of the result, then it may be admissible; or if the evidence is being introduced as a basis for a cause of action, then it may be admissible as well.

United States v. Bowen, 857 F.2d 1337, 1341 (9th Cir. 1988) (emphasis added).

The exclusion of the evidence that Plaintiff refused the polygraph test is not unduly prejudicial to Defendant.  The evidence's probative value was not great because the evidence does not show that Defendant premised its termination decision or the emails on Plaintiff's refusal to take the polygraph test.  See United States v. Bowen, 857 F.2d 1337, 1342 (9th Cir. 1988) (affirming exclusion of polygraph evidence on prejudice grounds, even when the evidence would be used not to prove the truth of the polygraph results).

**7.     Conclusion.**

For the foregoing reasons, the Court will deny Defendant's renewed motion for judgment as a matter of law and motion for new trial.

## **ORDER**

Accordingly, IT IS HEREBY ORDERED that Defendant's renewed motion for judgment as a matter of law and motion for new trial (Doc. No. 189) are DENIED.

IT IS SO ORDERED.

Dated:   September 28, 2020

_____
SENIOR  DISTRICT  JUDGE